# Wytheville.

## N. & W. R. R. Co. v. Commonwealth.

88 — 95
90 — 32
90 — 300

88 — 95
93 — 751
o93 — 763

### June 25th, 1892.

1. CONSTITUTION—*Test—Effect of statute.*—Whatever the language, the constitutionality of a statute is determined by its natural and reasonable effect.
2. IDEM—*Interstate Sunday trains*—Statutes forbidding interstate freight trains to run on a Sunday are by their necessary operation, whatever their professed object, a regulation of or an obstruction to interstate commerce.
3. IDEM—*Void statutes.*—Code, 1887, § 3891, as to Sunday trains, is inconsistent with United States Constitution, article 1, § 8, giving Congress power to regulate interstate commerce, and void as to trains running between different states.

Error to judgment of circuit court of Pulaski county, rendered March 25th, 1891, affirming judgment of county court of said county against the Norfolk and Western railroad company for a misdemeanor. The indictment was for running a train of cars on a Sunday, contrary to the act of March 19th, 1884, now carried into section 3801 of the Code. That act forbids the running of trains between sunrise and sunset on a Sunday, except such as are used exclusively for the relief of wrecked or disabled trains; or for the transportation of the United States mails, passengers, live-stock, or articles of such perishable nature as would be necessarily impaired in value by one day's delay in their passage. Section 5258, Revised Statutes (U. S.), however, not noted in the indictment, makes every railroad in the country, operated by steam, an agency of commerce for the transportation, among other things, of "freights on their way from one state to another state."

There was a motion to quash the indictment, on the ground that it was not sufficiently certain—that is to say, that even admitting the charge in the indictment to be true, the defendant was not necessarily guilty of any offence under the laws of the land—which motion was overruled, whereupon the defendant pleaded not guilty. The facts were agreed at the trial, and are as follows :

That on Sunday, the 21st day of September, 1890, the defendant, by its agents and employees, ran over the New river division of its road, in Pulaski county, after 9 o'clock in the morning, and before sunset, a train of cars loaded with coal and coke, which was being transported from Bluefield, a station on defendant's road in the state of West Virginia, into and through Virginia, and that said train was being run only for the transportation of said coal and coke.

The defendant demurred to the evidence, whereupon the jury conditionally assessed the fine at fifty dollars. The county court overruled the demurrer, and rendered a judgment for the fine assessed, which judgment was afterwards affirmed by the circuit court.

*Phlegar & Johnson*, and *Brown & Moore*, for plaintiff in error.

*Attorney-General R. Taylor Scott*, and *D. S. Pollock*, for commonwealth.

LEWIS, P. (after stating the case), delivered the opinion of the court.

The defendant's contention on the merits in the trial court and here, is that the statute upon which the indictment was founded is, so far as it applies to a case like the present, repugnant to the Constitution of the United States, which gives to Congress the power to regulate commerce among the several states. The precise propositions contended for on this

point are—(1) That the act of transportation mentioned in the proceedings was commerce between the states; (2) that such commerce is, as to all matters that admit of uniformity of regulation, subject only to congressional regulation; (3) that section 3801 of the Code is a regulation of commerce; and (4) that as such it cannot be applied to interstate commerce or to the train in question.

It is an historical fact, well known, that to secure uniformity and freedom in commercial intercourse, and with that view to establish a single government empowered to regulate commerce, was the chief consideration that lead to the formation and adoption of the Federal Constitution. Accordingly that instrument ordains that " Congress shall have power to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." Article I, § 8.

The power thus conferred, as the Supreme Court of the United States has repeatedly decided, is complete and exclusive. It is the unlimited power, in other words, to prescribe rules by which commerce shall be governed, and to determine how far it shall be free and untrammeled. Any attempt, therefore, by a state to regulate foreign or interstate commerce, is the attempted exercise of a power which has been surrendered by the states, and granted exclusively to the national government. It is an attempt to do that which Congress alone is authorized to do, and hence is a nullity.

As was said in *Hannibal, &c. R. R. Co.* v. *Husen,* 95 U. S. 465 : " Whatever may be the power of a state over commerce that is completely internal, it can no more prohibit or regulate that which is interstate, than it can that which is with foreign nations. Power over one is given by the constitution to Congress in the same words in which it is given over the other, and in both cases it is necessarily exclusive." And in a subsequent part of the same opinion it was said that transportation is not only essential to commerce, but that it is commerce itself, and that every obstacle to it, or burden laid upon it, by legislative

authority, is *regulation.* See, also, *County of Mobile* v. *Kimball,* 102 U. S. 691; *McCall* v. *California,* 136 U. S. 104.

"It cannot be too strongly insisted upon," said the court in *Wabash, &c. R. R. Co.* v. *Illinois,* 118 U. S. 557, "that the right of continuous transportation from one end of the country to the other, is essential in modern times to that freedom of commerce from the restraints which the states might choose to impose upon it, that the commerce clause of the constitution was intended to secure. And it would be a very feeble and almost useless provision, but poorly adapted to secure the entire freedom of commerce among the states, which was deemed essential to a more perfect union by the framers of the constitution, if, at every stage of the transportation of goods and chattles through the country, the state within whose limits a part of the transportation must be done, could impose regulations concerning the price, compensation, or taxation, or any other restrictive regulation interfering with and seriously embarrassing this commerce."

And in a still more recent case it was remarked that, in the matter of interstate commerce, the United States are but one country, and are, and must be subject to one system of regulations, and not to a multitude of systems. *Robbins* v. *Shelby County Taxing District,* 120 U. S. 489.

There is, indeed, what has been termed a kind of neutral ground, which may be constitutionally occupied by the state, so long as it interferes with no act of Congress. Thus, where the subject is local in its nature or sphere of operation, such as the establishment of highways, the construction of bridges over navigable streams, the regulation of harbor pilotage, the erection of wharves, piers and docks—in these and other like cases, which are considered as mere aids rather than regulations of commerce, the state may act until Congress supersedes its authority. But where the subject is national in its character, admitting of uniformity of regulation, such as the transportation and exchange of commodities between the states, Congress alone can act upon it.

The case of *Cooley* v. *Port Wardens of Philadelphia*, 12 How. 299, is sometimes cited as an authority to the contrary—that is, for the proposition that in the absence of congressional action, a state may regulate interstate commerce within its own territorial limits. But this statement is broader than the decision justifies; for it was expressly said in that case that " whatever subjects of this power are in their nature national, or admit of only one uniform system, or plan of regulation, may be justly said to be of such a nature as to require exclusive legislation by Congress."

And in the very recent case of *Leisy* v. *Hardin*, 135 U. S. 100, known as " the Original Package Case," where the subject is fully considered, Mr. Chief-Justice Fuller, in delivering the opinion of the court, used the following language:

" The power to regulate commerce among the states is a unit, but, if particular subjects within its operation do not require the application of a general or uniform system, the states may legislate in regard to them with a view to local needs and circumstances, until Congress otherwise directs; but the power thus exercised by the states is not identical in its extent with the power to regulate commerce among the states. The power to pass laws in respect to internal commerce, inspection laws, quarantine laws, health laws, and laws in relation to bridges, ferries and highways, belongs to the class of powers pertaining to locality, essential to local inter-communication, to the progress and development of local prosperity, and to the protection, the safety and welfare of society, originally necessarily belonging to, and upon the adoption of the constitution reserved by the states, except so far as falling within the scope of a power confided to the general government." But these powers, it was said, " though they may be said to partake of the nature of the power granted to the general government, are strictly not such, but are simply local powers, which have full operation until or unless circumscribed by the action of Congress in effectuation of the general power."

And in the same case the principle was again announced, as it had often been before, that the transportation of passengers or of merchandise from one state to another, is in its nature not local but national, and, therefore, admitting of but one regulating power.

These authorities, which are only a few of many that might be cited to the same effect, are sufficient to show the invalidity of legislation by the states in regard to subjects of commerce which are in their nature national, no matter what may be the avowed object of such legislation, and that nothing is gained by calling it the police power. The subject was elaborately discussed, and with his accustomed force, by Mr. Justice Miller in *Henderson* v. *Mayor of New York*, 92 U. S. 259, where it was declared that however difficult it may often be to distinguish between one class of legislation and another, it is clear from our complex form of government that whenever the statute of a state invades the domain of legislation which belongs exclusively to Congress, it is void, no matter under what class of power it may fall, or how closely allied to powers conceded to belong to the states.

In *Hannibal, &c. R. R. Co.* v. *Husen*, *supra*, it was said: "We admit that the deposit in Congress of the power to regulate foreign commerce and commerce among the states, was not a surrender of that which may properly be denominated police power. What that power is, it is difficult to define with sharp precision. It is generally said to extend to making regulations promotive of domestic order, morals, health and safety. * * * But whatever may be the nature and reach of that power," it was added "it cannot be exercised over a subject confided exclusively to Congress by the Federal Constitution. It cannot invade the domain of the national government."

Nor does it matter in such a case that Congress has not acted; for it is now settled that the silence of Congress is not only not a concession that the powers reserved by the states may be exerted as if the specific power had not been else-

where reposed, but on the contrary, the only legitimate conclusion is that the general government intended that power should not be affirmatively exercised, and the action of the states cannot be permitted to effect that which would be incompatible with such intention. "Hence," as was decided in *Leisy* v. *Hardin*, 135 U. S. 100, following many previous decisions, "inasmuch as interstate commerce, consisting in the transportation, purchase, sale and exchange of commodities, is national in its character, and must be governed by a uniform system, so long as Congress does not pass any law to regulate it, or allowing the states so to do, it thereby indicates its will that such commerce shall be free and untrammeled."

In *Norfolk & Western R. R. Co.* v. *Pennsylvania*, 136 U. S. 114, the court, in an opinion by Mr. Justice Lamar, said:

"Whenever a commodity has begun to move as an article of trade from one state to another, commerce in that commodity between the states has commenced. The fact that several different and independent agencies are employed in transporting the commodity, some acting entirely in one state, and some acting through two or more states, does in no respect affect the character of the transaction. To the extent in which each agency acts in that transaction, it is subject to the regulation of Congress."

It is also a well-established principle that an article of commerce transported from one state to another, is protected by the constitution against interfering state legislation, until it has mingled with and become a part of the common mass of property within the latter state; and if this be so, *a fortiori* is protected while *in transitu*. *Brown* v. *Maryland*, 12 Wheat. 419; *Welton* v. *Missouri*, 91 U. S. 275; *Leisy* v. *Hardin*, 135 *Id.* 100.

Tested by these principles, which are axiomatic, it is clear that the judgment complained of is erroneous.

That the transportation of the coal and coke mentioned in the proceedings, was an act of commerce, national in its character, is too plain to admit of doubt. And it is equally celar

that the legislation in question, in so far as it extends to a case like the present, is unwarranted and void. A statute which forbids the running of interstate freight trains between sunrise and sun-set on a Sunday, is, by its necessary operation, no matter what its professed object may be, a regulation of commerce. At all events, it is an obstruction to interstate commerce, which for the purposes of the present case, amounts to the same thing; for, in any view, it is an invasion of the exclusive domain of Congress, and, therefore, void.

To say that the state may, in the exercise of her police powers, enforce by statute observance of the Sabbath, not as a religious duty but as a day of rest, is no answer to the constitutional objection here raised. The validity of such legislation, when not in conflict with a higher law, is acknowledged by all, and its wisdom and propriety denied by none—certainly not by this court. But when, in a case like the present, it contravenes the Constitution of the United States, the latter must prevail, because it is "the supreme law" in all matters relating to the regulation of interstate commerce.

Such a statute, if passed by Congress, so far as it concerns foreign or interstate commerce, would be valid, not, however, as the exercise of police power, but as a regulation of commerce. And the reason which would make such legislation valid as an act of Congress, makes it invalid as an act of a state legislature.

As to the effect of the statute in question, if sustained, upon the commercial interests of the country, we need not stop to inquire. It is enough to say that, to the extent indicated, it is not valid.

In *Henderson* v. *Mayor of New York, supra,* it was decided that whatever may be the nature and extent of the police power of a state, "no definition of it, and no urgency for its use, can authorize a state to exercise it in regard to a subject-matter which has been confided exclusively to the discretion of Congress by the constitution."

This principle was reaffirmed in *Leisy* v. *Hardin,* where it is

said that such a subject-matter is not within the police power
of a state, unless placed there by congressional action. And
the observations of Mr. Justice Mathews in *Bowman* v. *Chicago,
&c. Ry. Co.*, 125 U. S. 465, were quoted with approval, to the
effect that in view of the commercial anarchy and confusion
that would result from the diverse exertions of power by the
several states of the Union, it cannot be supposed that the con-
stitution or Congress have intended to limit the freedom of
commercial intercourse among the people of the several states.

The fact, if it be a fact, that the statute in question was not
intended as a regulation of commerce, does not, we repeat,
affect the case. There may be no purpose, it has been held,
upon the part of a legislature to violate the constitution, and
yet a statute enacted under the forms of law may, by its neces-
sary operation, injuriously affect rights secured by the consti-
tution, in which case the statute to that extent must be declared
void. *Brimmer* v. *Rebman*, 138 U. S. 78. This is merely stating
in different form the proposition affirmed in the *Henderson
Case*, namely, that in whatever language a statute may be
framed, its constitutional validity must be determined by its
natural and reasonable effect—a proposition that would seem
to be incontrovertible.

In the last-mentioned case, a statute of New York which
required the master or owner of every vessel landing passen-
gers at the port of New York from a foreign country to give
a bond in a prescribed penalty for each passenger so landed,
as an indemnity against any expense to be incurred by the
state or city for the support of such passengers, was held void,
as being a regulation of commerce, although it was sought to
be sustained as a police regulation to protect the state against
the influx of paupers, the practical result of the statute being
to impose a burden upon all the passengers so landed from a
foreign country.

So in the case of *Chy Lung* v. *Freeman*, 92 U. S. 275, a simi-
lar statute of California, intended to prevent the introduction

of lewd women into that state, was held void, as going beyond the necessity of the case, and amounting, in its practical operation, to a regulation of foreign commerce.

Upon the same principle, statutes prohibiting the introduction of intoxicating liquors into the states enacting them, have been held to be infringements of the commerce clause of the constitution, and not valid police regulations to guard against the evils of intemperance. And numerous illustrations of the same principle are to be found in the adjudged cases, all of which show that when in the attempted exercise of the police power, no matter upon what ground it is sought to be exercised, the action of a state comes in conflict with a power vested exclusively by the constitution in Congress, such attempt is a nullity; and the present case comes within this principle.

The power of the state to enforce observance of the Sabbath, as a police regulation, stands upon no higher footing than her power to guard against the evils of vice or intemperance, or of imported pauperism, or infectious diseases. In either case the nature and extent of the power is exactly the same, and there is no principle for holding otherwise.

Our attention has been called in this connection to *State* v. *Railroad Company*, 24 W. Va. 783, wherein a "Sunday Law," so called, similar to the one we have been considering, was upheld under circumstances resembling those of the present case. The court in that case admitted that transportation between the states is commerce between the states, and that such commerce is necessarily under the exclusive control of Congress. But it denied that non-action by Congress is equivalent to a declaration that such commerce shall be free and untrammeled, and upon that ground sustained the statute *in toto*.

As to the last proposition, we have already shown by the cases referred to—some of them decided since that case was decided—that the rule is otherwise, and, after a careful exami-

nation of the case, we find nothing in it to raise a doubt that the rule has been rightly settled.

The judgment must, therefore, be reversed, and the defendant discharged from further prosecution under this indictment, which ought to have been quashed.

LACY, J. (dissenting), said :

This is a writ of error to a judgment of the circuit court of Pulaski county, rendered at the March term, 1891, when the circuit court affirmed the judgment of the county court, rendered at the February term, 1891, of said county court, where the plaintiff in error was convicted for a violation of the Sunday laws of this commonwealth, and adjudged to pay a fine of fifty dollars.   It is admitted that the said plaintiff in error openly violated the law of the state, upon the ground that it is in violation of the Constitution of the United States, because it is an interference by the state with the subject of commerce among the states; that the Constitution of the United States provides (article I, section 8) that the Congress shall have power to regulate commerce with foreign nations, and among the states, and with the Indian tribes.   Our Code provides that " if a person, on a Sabbath day, be found laboring at any trade or calling, or employ his apprentices or servants in labor or other business, except in household or other work of necessity or charity, he shall forfeit two dollars for each offence. Every day any servant or apprentice is so employed shall constitute a distinct offence."   Code of Virginia, section 3799. This plaintiff in error is a domestic corporation, domiciled within the state of Virginia, holding its chartered rights under the grant of the state, whose charter, by its express terms, provides that it may be altered, modified, or repealed by any future legislature as they may think proper.   *Id.* § 1240.   The absolute prohibition against laboring at its calling being, in the legislative mind, inexpedient in its application to this or

other domestic corporations, the legislature, in 1884, enacted a statute which modified the general law, and excepted such trains as were loaded with passengers and perishable freight, and which suffer injury by delay, and provided as follows: "No railroad company, receiver, or trustee controlling or operating a railroad shall, by any agent or employee, load, unload, run, or transport upon such road on a Sunday, any car, train of cars, or locomotive, nor permit the same to be done by any such agent or employee, except when such cars, trains, or locomotives are used exclusively for the use of wrecked trains, or trains so disabled as to obstruct the main track of the railroad or for the transportation of the United States mail, or for the transportation of passengers and their baggage, or the transportation of live-stock, or for the transportation of articles of such perishable nature as would be necessarily impaired in value by one day's delay in their passage: provided, however, that if it should be necessary to transport live-stock or perishable articles on a Sunday to an extent not sufficient to make a whole train-load, such train load may be made up with cars loaded with ordinary freight." Section 3802 provides that "the word 'Sunday' in the preceding section shall be construed to embrace only that portion of the day between sunrise and sunset; and the trains *in transitu* having started prior to 12 o'clock on Saturday may, in order to reach the terminus or shops of the railroad, run until 9 o'clock the following Sunday morning, but not later." Section 3803 provides the penalty, which is immaterial in this case, the fine assessed not being in violation thereof. These sections constitute our Sunday laws, not very stringent, it must be admitted, as far as railroads are concerned; its extreme liberality in the privileges. to labor on the Sabbath accorded therein suggesting the thought that, when the law was drawn, the railroads in some form stood by consenting, but how this is I have no information. However that may be, the law is now obnoxious to the railroad in question, and in some localities the lower courts have refused to enforce the law.

The question now to be inquired into is, What is the nature of this law? Is it an act to regulate commerce with foreign nations, or among the states, or with the Indian tribes? And does it thus invade the granted powers of the Congress, under the Constitution of the United States, and conflict with them? If so, it cannot be upheld. It certainly was not so intended. Nothing is said about commerce nor about transportation between the states. It is absolutely limited in its operations to the state of Virginia. It is to be found in the chapter of our Code entitled "Of offences against morality or decency; protection of religious meetings." The section which precedes it is entitled "Profane swearing and drunkenness; how punished." The section which succeeds it is entitled "Sale of intoxicating liquors on Sunday; how punished." The next is "Disturbance of religious worship; how punished." It is intended as an exercise of the police power of the state, in the interest of morality and decency, and that is what I think it is. It is no part of the province of Congress, under its granted powers, to enact police laws for the regulation of such affairs within a state; and if this state may not enact, for the protection of its citizens, police laws for the observance of the Sabbath day, we must ever remain practically without such. I think I am sustained in this view by the decision of the courts of this country, both State and Federal; and I will briefly proceed to consider this. Commerce consists of the various agreements which have for their object facilitating the exchange of the products of the earth, or the industry of man, with the intent to realize a profit. Commerce with foreign countries and among the states, strictly considered, consists in intercourse and traffic, including in these terms navigation, and the transportation of persons and property, as well as the purchase, sale, and exchange of commodities. The power conferred upon the Congress by the above cause is conclusive, so far as it relates to matters within its purview which are material in their character, and admit of a requisite uniformity of regu-

lation affecting all the states. That clause was adopted in order to secure uniformity against discriminating state legislation. State legislation is not forbidden in matters either local in their operation, or intended to be mere aids to commerce, for which special regulations can more effectually provide, such as harbors, pilotage, beacons, buoys, and other improvements of harbors, bays, and rivers within a state, if their free navigation be not thereby impaired. Congress, by its inaction in such matters, virtually declares that until it deems best to act they may be controlled by the state. *County of Mobile* v. *Kimball,* 102 U. S. 691. (Opinion of Mr. Justice Field.) In the case of *Sherlock* v. *Alling,* 93 U. S. 99, the same learned justice said: " In supposed support of this position numerous decisions of this court are cited by counsel to the effect that the states cannot by legislation place burdens upon commerce with foreign nations or among the several states." Upon an examination of these cases it will be found that the legislation adjudged invalid imposed a tax upon some instrument or subject of commerce, or exacted a license fee from parties engaged in commercial pursuits, or created an impediment to the free navigation of some public waters, or prescribed conditions in accordance with which commerce in particular articles or between places was required to be conducted. In all the cases the legislation condemned operated directly upon commerce, either by way of tax upon its business, license upon its pursuits in particular channels, or conditions for carrying it on. Thus, in the *Passenger Cases,* reported in 7 How. 445, the laws of New York and Massachusetts exacted a tax from the captains of vessels bringing passengers from foreign ports for every passenger landed. In *Pennsylvania* v. *Wheeling, etc., Bridge Co.,* reported in 13 How. 518, the statute of Virginia authorized the erection of a bridge which was held to obstruct the free navigation of the river Ohio. And in all the other cases, when legislation of a state has been held to be null for interfering with the commercial power of Congress—

as in *Brown* v. *Maryland*, 12 Wheat. 425; *Tax Cases*, 12 Wall. 204; and in *Welton* v. *Missouri*, 91 U. S. 275—the legislation created in the way of tax, license, or condition, a direct burden of commerce, or in some way directly interfered with its freedom; and it may be said generally that the legislation of a state not directed against commerce or any of its regulations, but relating to the rights, duties, and liabilities of citizens, and only indirectly and remotely, affecting the operations of commerce, is of obligatory force upon citizens within its territorial jurisdiction, whether on land or engaged in commerce, foreign or interstate, or in any other pursuit. Judge Cooley says, in his work on Constitutional Limitations (page 722) : " The line of distinction between that which constitutes an interference with commerce and that which is a mere police regulation is something dim and shadowy, and it is not to be wondered at that learned jurists differ when endeavoring to classify the cases which arise. It is not doubted that Congress has the power to go beyond the general regulations of commerce which it is accustomed to establish, and to descend to the most minute directions, if it shall be deemed advisable; and to whatever extent ground shall be covered by these directions the exercise of state power is excluded. "

Congress may establish police regulations as well as the states, confining their operations to the subjects over which it is given control by the constitution. But as the general police power can better be exercised under the supervision of the local authorities, and mischiefs are not likely to spring therefrom so long as the power to arrest collision resides in the national courts, the regulations that are made by Congress do not often exclude the establishment of others by the state covering very many particulars. Moreover, the regulations of commerce are usually, and in some cases must be, general and uniform for the whole country; while in some localities state and local policy will demand peculiar regulations with reference to special and peculiar circumstances." In the late case

of *Cardwell* v. *Bridge Co.*, 113 U. S. 205, 5 Sup. Ct. Rep. 423, after citing the earlier cases, the court said that they illustrate the general doctrine, now fully recognized, that the commercial power of Congress is exclusive of state authority only when the subjects upon which it is exerted are national in their character, and admit and require uniformity of regulations affecting all the states; and that when the subjects within that power are local in their nature or operation, or constitute mere aids to commerce, the states may provide for their regulation and management until Congress interferes and supersedes their action. I will cite as an illustration of my view of this subject yet another decision of the Supreme Court of the United States upon this subject, which applies to a through line of railway, and is much in point. In the case of *Stone* v. *Trust Co.*, 116 U. S. 307, 6 Sup. Ct. Rep. 334, 388, 1191 (one of the railroad commission cases), that court said: " There can be no doubt that each of the states through which the Mobile & Ohio railroad passes incorporated the company for the purpose of securing the construction of a continuous line of interstate communication between the Gulf of Mexico, in the south, and the Great Lakes in the north. It is equally certain that Congress aided in the construction of parts of this line of road, so as to establish such a route of travel and transportation; but it is none the less true that the corporation created by each state is, for the purposes of local government, a domestic corporation, and that its railroad within the state is a matter of domestic concern. Mississippi may govern this corporation as it does all domestic corporations, in respect to every act, and everything within the state which is the lawful subject of state government. It may, beyond all question, by the settled rule of decision of this court, regulate freights and fares for business done exclusively within the state; and it would seem to be a matter of domestic concern to prevent the company from discriminating against persons and places in Mississippi. So it may make all needful reg-

ulations of a police character for the government of the company while operating its road in that jurisdiction. In this way it may certainly require the company to fence, etc., as much of its road as lies within the state, to stop its trains at railroad crossings, to slacken speed while running in a crowded thoroughfare, to put its tariffs and time-tables at proper places, etc.   This, company is not entirely relieved from state control in Mississippi, simply because it has been incorporated by, and is carrying on business in, the other states through which its road runs.   While in Mississippi it can be governed by Mississippi in respect to all things which have not been placed by the Constitution of the United States within the exclusive jurisdiction of Congress.   It is not enough to prevent the state from acting that the road in Mississippi is used in aid of interstate commerce.   Legislation of this kind, to be unconstitutional, must be such as will necessarily amount to or operate as a regulation of business without the state as well as within." See, also, *Smith* v. *Alabama*, 124 U. S. 465, 8 Sup. Ct. Rep. 564; *Railroad Co.* v. *Alabama*, 128 U. S. 96, 9 Sup. Ct. Rep. 28; *Railroad Co.* v. *People*, 105 Ill. 657; *Rae* v. *Railroad Co.*, 14 Fed. Rep. 401; *Iowa* v. *Railroad Co.*, 33 Fed. Rep. 391; *Railroad Co.* v. *Becker*, 32 Fed. Rep. 849. And as to the right of the state to regulate the charge for taking on through cars—" switching," as it is called—by a state commission, it was held to have no reference to interstate commerce, in the the case of *Railroad Co.* v. *Becker, supra.*   And again it was held in the state of *Iowa* v. *Railroad Co.*, 33 Fed. Rep. 391, that, even if such switching be an act of interstate commerce, such regulation is valid, as it does not refer to the carriage of freight outside the state. And, again, it was said by the Supreme Court of the United States in *Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 5 Sup. Ct. Rep. 826, that the power to prescribe regulations to protect the health of the community, and to prevent the spread of disease, is incident to all local municipal authority, however much such regulations may

interfere with interstate commerce. The interstate commerce act itself, passed February 4, 1887, and amended March 2, 1889, when Congress subjected to its control all common carriers engaged in continuous interstate or international transportation of passengers or property, was held not to include the carriage or handling of passengers, by rail or otherwise, when such carriage or handling is performed wholly within a state. *Ex-parte Koehler*, 30 Fed. Rep. 867. This is the result of all the decisions of the Federal courts. If the act in question only applies to and operates upon transportation within the state, it is immaterial that which the company operated on is part of an interstate line. It must not only affect commerce, but it must affect commerce with foreign nations or among the states, or with the Indian tribes. But if the act is one done in the exercise of a police power, it is within the legitimate and unchallenged domain of the state; such as to regulate concerning the public health, public peace, and morality and decency.

Now, what is this police power, and where does it reside? It is defined to be the authority to establish, for the intercourse of the several members of the body politic with each other, those rules of good conduct and good neighborhood which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own, so far as is reasonably consistent with a corresponding enjoyment by others, and is usually spoken of as the authority or power of police. This is a most comprehensive branch of sovereignty, extending, as it does, to every person, every public and private right, everything in the nature of property, every relation in the state, in society, and in private life. The power vested in the legislature to make, ordain, and establish all manner of wholesome and reasonable laws, statutes and ordinances as they shall judge to be for the good and welfare of the commonwealth, and for the subjects of the same. The exercise of this power, at least, has been left with the individual states,

and cannot be taken from them, and exercised wholly or in part under legislation of Congress.   Cooley, Const. Lim. 715 ; *U. S.* v. *Dewitt*, 9 Wall. 41.   Quarantine and health laws of every description, proper regulations for the use of highways, and the general right to control and regulate the public use of navigable waters are unquestionably with the state under the police power.   Indeed, the police power of a state, in a comprehensive sense, embraces its whole system of internal regulations by which the state seeks, not only to preserve the public order, and to prevent offences against the state, but also to establish for the intercourse of citizen with citizen those rules of good manners which are calculated to prevent a conflict of rights.   Judge Cooley says, in the American constitutional system the power to establish the ordinary regulations of police, has been left with the states individually, and it cannot be taken from them, either wholly or in part and, exercised under legislation of Congress; so decided, as we have seen, in *U. S.* v. *Dewitt*, 9 Wall. 41.   Neither can the national government, through any of its departments or officers, assume any supervision of the police regulations of the states.   The state may also, under this power, says the same learned author, regulate the grade of railways, and prescribe how and upon what grade railway tracks may cross each other ; and it may apportion the cost of making the necessary crossings between the corporations owning the roads ; and it may establish regulations requiring existing railways to ring the bell or blow the whistles of their engines immediately before passing highways at grade, or other places when their approach might be dangerous to travel, or to station flagmen at such or any other dangerous places.   The legislature has power by general laws, from time to time, as the public exigencies may require, to regulate corporations in their franchises so as to provide for the public safety.   This is held to be a mere police regulation. *Railroad Co.* v. *Loomis*, 13 Ill. 548.   But certain powers directly affecting commerce may sometimes be exercised, when the

purpose is not to interfere with congressional legislation, but merely to regulate the time and manner of transacting business with a view to facilitate trade, secure order, and prevent confusion. *Vanderbilt* v. *Adams*, 7 Cow. 351, where Woodworth, J., states very clearly the principles on which police regulations are sustained in such cases.

We have said that the laws to prevent the desecration of the Sabbath came properly under the police power of the State. Judge Cooley says, on this subject, the statute for the punishment of public profanity requires no further justification than the natural impulses of every man who believs in a Supreme Being, and recognizes his right to the reverence of his creatures. The laws against the desecration of the christian Sabbath by labor or sports are not so readily defensible by arguments, the force of which will be admitted by all. The laws which prohibit ordinary employments are to be defended either on the same ground which justifies the punishment of profanity, or as establishing sanitary regulations, based upon the demonstration of experience that one day's rest in seven is needful to recuperate the exhausted energies of body and mind. Judge Cooley, speaking of those laws enacted to prevent desecration of the Sabbath, says they are not unconstitutional as a restraint upon trade and commerce. There can no longer be any question, if any there ever was, that such laws may be supported as regulations of police. *Specht* v. *Com.*, 8 Pa. St. 312; *Bloom* v. *Richards*, 2 Ohio St. 387; *Ex-parte Andrews*, 18 Cal. 678; *Ex-parte Bird*, 19 Cal. 130. Upon this subject of the Sabbath day observance, I have found none but state decisions in a great multitude of cited cases. It does not appear to have been ever, so far as my investigation has gone, whch has been somewhat limited, and not thorough, a matter of decision with the Federal courts, so far as the states are concerned. And I believe there is no probability that Congress will ever assume the right to regulate the observance of the Sabbath day in the states. If, however, it should ever do so,

I do not doubt that the American Congress will protect the American Sabbath day from unnecessary desecration, by whomsoever it is essayed.   Nor do I doubt that, if the Supreme Court of the United States should have this question under consideration, it would hold, as my view is, that the Sunday laws of this commonwealth are within the police powers of the state, and, moreover, that they in no wise affect interstate commerce, but, being limited in their operations to the state, whatever effect they have upon the through line of transportation outside of the state, it is no more than is proper, and in no way an interference with the granted power of the Congress. It is to be regretted, as it is a Federal question, that it cannot go up to the Supreme Court of the United States, and be settled there.   Holding the views I do, I am constrained to dissent from the opinion of the majority.

JUDGMENT REVERSED.