93  749
f98  103

# CRIMINAL CASES.

## 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

### NORFOLK & WESTERN R. Co. v. COMMONWEALTH.

#### JUNE 11, 1896.

Absent, Harrison, J.

1. INTERSTATE COMMERCE—*Sunday Laws—Empty Cars.*—Empty coal cars, which have been used exclusively to transport coal from one State to another, and which are intended to be so used again, are not, while being returned from one point in this State to another, engaged in transporting articles of interstate commerce, though *en route* to the coal-fields outside of this State; and the transportation of such cars is, therefore, controlled exclusively by the laws of this State. Such transportation on Sunday is forbidden by Sec. 3801 of the Code.

2. INTERSTATE COMMERCE—*Police Powers—Sunday Laws—Running Trains on Sunday.*—The right to enact laws to protect the lives, health, and property of the citizens of a State, and to preserve good order and the public morals, is a part of the police power reserved to the States, and though such laws may to some extent affect commerce and persons engaged in it, yet, if they are enacted in good faith, for such police purposes, without discriminating against interstate or foreign commerce, and Congress has not acted on the subject, they do not constitute a regulation of commerce within the inhibition of Art. I, Sec. 8, Clause 3, of the Constitution of the United States. Tested by this rule, Sec. 3801 of the Code, prohibiting the running or transportation, on Sunday, of certain locomotives and cars, is not in conflict with said clause of the Constitution of the United States, and is valid. Laws of this character are police regulations of the greatest utility for the physical and moral well-being of society. *Norfolk & Western R. Co.* v. *Commonwealth*, 88 Va. 95, overruled.

Argued at Richmond.    Decided at Wytheville.

Error to a judgment of the Circuit Court of Appomattox county, rendered December 10, 1894, affirming the judgment of the County Court of said county, rendered November 9, 1893, whereby the plaintiff in error was adjudged to pay a fine of $50 for running a freight train on Sunday.

*Affirmed.*

The opinion states the case.

*T. J. & F. S. Kirkpatrick* and *William H. Mann,* for the plaintiff in error.

*Attorney-General R. Taylor Scott,* for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

The plaintiff in error was indicted in the County Court of Appomattox county for violating sec. 3801 of the Code, which is as follows:

" No railroad company, receiver, or trustee controlling or operating a railroad, shall by any agent or employee, load, unload, run or transport upon such road on a Sunday, any car, train of cars, or locomotive, nor permit the same to be done by any such agent or employee, except where such cars, trains, or locomotives are used exclusively for the relief of wrecked trains, or trains so disabled as to obstruct the main track of the railroad; or for the transportation of United States mail; or for the transportation of passengers and their baggage; or for the transportation of live stock; or for the transportation of articles of such perishable nature as would be necessarily impaired in value by one day's delay in their passage : *Provided however,* that if it should be necessary to transport live stock or perishable articles on a Sunday to an extent not sufficient to make a whole train load, such train load may be made up with cars loaded with ordinary freight."

Sec. 3802 : " The word ' Sunday ' in the preceding section shall be construed to embrace only that portion of the day between sunrise and sunset; and trains *in transitu,* having started prior to twelve o'clock on Saturday night, may, in order to reach the terminus or shops of the railroad, run until nine o'clock the following Sunday morning, but not later."

The case was tried upon the following agreed state of facts:

"That the train, composed of empty coal cars, which are used exclusively in the coal business, as described below, passed through Appomattox county and by Appomattox station between 9 o'clock A. M. and 3 o'clock P. M. of Sunday, April 2d, 1893, going from Crewe to Roanoke, said points being divisional terminal points on the N. & W. R. R. That when the train arrived at Roanoke it would be broken up in the company's yard and as soon as practicable would be put into another train, with another engine and crew, and sent by way of Bluefield, in West Virginia, to the coal mines at Pocahontas, in Virginia, and to others in West Virginia. At these mines the cars would be loaded and sent by way of Bluefield, in West Virginia, to Lambert's Point, in Virginia. The coal so shipped would be coal sold to parties out of the State of Virginia before it leaves Bluefield and to be conveyed to the purchasers outside of Virginia by way of Bluefield, W. Va., and Lambert's Point, Va.

"That said train was not one of those included in the exceptions in section 3801, Code of Virginia, 1887."

The plaintiff company was found guilty and fined, and the judgment of the County Court was affirmed by the Circuit Court. The action of the Circuit Court in affirming the judgment is complained of, and is before us for review in this case.

In the case of the *Norfolk & Western Railroad Co.* v. *The Commonwealth,* reported in 88 Va. 95, this court held that the statute under which the indictment in this case was made was inconsistent with the commerce clause of the Constitutution of the United States in so far as it applied to trains running between different States, or engaged in transporting interstate commerce, and therefore void.

The counsel for the plaintiff company insists that the principle decided in that case is the same that is involved in this case, and conclusive of it. On the other hand, the Attorney-General, for the Commonwealth, contends that the questions

involved in the two cases are different, and if they were the same that the decision relied on as controlling this is erroneous, and ought not to be followed.

The train which the plaintiff company was indicted for running in violation of section 3801 of the Code was made up entirely of empty cars, which it was agreed were used exclusively in carrying articles of interstate commerce.

The fact that they had been so used in the past, and were intended to be so used in the future, does not show that they were, at the time when the act was done for which the plaintiff company was indicted, engaged in interstate commerce.

The Supreme Court of the United States, in *Coe* v. *Erroll*, 116 U. S. 517, 525, held:

" When the products of the farm or the forest are collected and brought in from the surrounding country to a town or station serving as an entrepot for that particular region, whether on a river or line of railroad, such products are not yet exports, nor are they in process of exportation, nor is exportation begun until they are committed to the common carrier for transportation out of the State to the State of their destination, or have started on their ultimate passage to that State. Until then it is reasonable to regard them as not only in the State of their origin, but as a part of the general mass of property of that State, subject to its jurisdiction, and liable to taxation there, if not taxed by reason of their being intended for exportation, but taxed without discrimination, in the usual way and manner in which such property is taxed in the State."

If this be the true rule by which to determine when the products of the mine become articles of interstate commerce, and cease to be controlled entirely by the laws of the State, why is it not the correct rule to determine when the carrier of such products becomes engaged in transporting interstate commerce, and is protected and governed by the laws of the United States?    In the one case, the miner may intend to

ship a particular product to another State, and may be preparing the articles for shipment, yet it is not an article of interstate commerce until it starts upon its final destination to that State, and until that time is subject to the laws of the State alone, and has none of the rights of an article of interstate commerce. In the other case, the carrier may be preparing certain cars upon which to transport the products of the miner to the foreign State, and they may be on their journey to the place from which they are to be shipped, yet why should those cars be considered as engaged in interstate commerce until they are loaded with articles committed to the carrier to be transported to another State?

The reason given for the rule that goods do not become an article of interstate commerce until actually put in motion for some place out of the State, or committed to the carrier for such transportation, is that until that time the article, though intended for exportation, may never be exported, as the owner has the perfect right to change his mind at any time. The common carrier has the same right to change his mind, and ship on other cars than those which he may have provided for that purpose, and the cars which were intended for that purpose may never be used.

The rule fixed by the Supreme Court in the one case seems equally applicable to the other. Applying that rule to the facts of this case, it would seem that the train for which the plaintiff company was indicted for running was not when so running engaged in transporting articles of interstate commerce, and was, therefore, controlled exclusively by the laws of the State. But if this be not the correct view, and it be held that the plaintiff in running the train was engaged in the business of interstate commerce, was the legislation in question within the powers reserved to the State, and not in conflict with the Constitution of the United States?

The right of the State to enact laws to protect the lives, health, and property of its citizens, and to preserve good

order and the public morals is a matter of so much conse-
quence, and so far-reaching in its effects, that its courts ought
not to hold that the statutes made for that purpose are in-
consistent with the Constitution of the United States unless
they are plainly so.

"Questions of this nature," as was said by Mr. Justice
Story, in *Houston* v. *Morse*, 5 Wheat. 1, at an early day in
our judicial history, "are always of great importance and
delicacy. They involve interests of so much magnitude and
of such deep and permanent public concern that they can-
not be approached without anxiety. The sovereignty of a
State, in the exercise of its legislation, is not to be impaired
unless it be clear that it has transcended its legitimate au-
thority, nor ought any power to be sought, much less to be
adjudicated, in favor of the United States, unless it be clearly
within the reach of its constitutional charter."

And in the very recent case of *Plumley* v. *Massachusetts*,
decided at the last term of the same court, and reported in
155 U. S. 461, the court, speaking through Mr. Justice Harlan
(at pages 479–80), said:

" We are not unmindful of the fact, indeed this court has
often had occasion to observe, that the acknowledged pow-
ers of the States to protect the morals, the health, and safety
of their people by appropriate legislation, sometimes touches,
in its exercise, the line separating the respective domains of
National and State authority. But in view of the complex
system of government which exists in this country, 'pre-
senting,' as this court, speaking by Chief Justice Marshall,
has said, 'the rare and difficult scheme of one general gov-
ernment whose action extends over the whole, but which
possesses only certain enumerated powers, and of enume-
rated State governments, which retain and exercise all pow-
ers not delegated to the Union, the judiciary of the United
States should not strike down a legislative enactment of a
State, especially if it has direct connection with the social

order, the health, and morals of its people, unless such legislation plainly and palpably violates some right granted or secured by the National Constitution, or encroaches upon the authority delegated to the United States for the attainment of objects of national concern."

As the Supreme Court of the United States is the final arbiter of questions of this nature, we must look to its decisions for guidance in determining the question. Neither the counsel nor the court have been able to find any decision of that court upon the particular question involved in this case. In fact, counsel admit that there is no such decision.

Numerous decisions have been made by that court, however, in which the powers delegated to the United States by the commerce clause of the Constitution, and the police powers reserved by the States, have been considered, and whilst these decisions are not altogether consistent and harmonious, yet from them are to be gathered the principles which must govern us in the decision of this case.

Chief Justice Marshall, in the leading case of *Gibbons* v. *Ogden*, 9 Wheaton, 203, which involved the inspection laws of one of the States, said:

" They form a portion of that immense mass of legislation which controls everything within the territory of a State not surrendered to the general government, all of which can be most advantageously administered by the States themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating internal commerce of a State, and those which respect turnpike roads, ferries, &c., are component parts. No direct general power of these objects is granted to Congress, and consequently they remain subject to State legislation."

Mr. Justice Grier, in the Passenger Cases, 7 How., at page 457, in discussing the police powers of the State of Massachusetts, said:

" This right of the States has its foundation in the sacred

law of self-defence, which no power granted to Congress can restrain or annul.   It is admitted by all that those powers which relate to merely municipal legislation, or what may be more properly called *internal police,* are not surrendered or restrained; and that it is as competent and necessary for a State to provide precautionary measures against the moral pestilence of paupers, vagabonds, and convicts as it is to guard against physical pestilence which may arise from unsound and infectious articles imported."

In the Slaughter-house Cases, 16 Wall. at page 62, Mr. Justice Miller, speaking for the court, said:

" The power " (police) " here exercised by the Legislature of Louisiana is, in its essential nature, one which has been, up to the present period in the constitutional history of this country, always conceded to belong to the States, however it may now be questioned in some of its details."

Again he says:

" This power is, and must be from its very nature, incapable of any very exact definition or limitation.   Upon it depends the security of social order, the life and health of the citizen, the comfort of an existence in a thickly populated community, the enjoyment of private and social life, and the beneficial use of property."

He then quotes with approval the language of Chief Justice Redfield in the case of *Thorpe* v. *Rutland and Burlington R. R. Co.,* 27 Vermont 140, as follows:

" It extends," says an eminent judge, " to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property within the State,   *   *   * and persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the State.   Of the perfect right of the Legislature to do this, no question was, or upon acknowledged general principles ever can be made, so far as natural persons are concerned."

It was said by Mr. Justice Davis, in *Peete* v. *Morgan*, 19 Wall. 581, 582:

" That the power to establish quarantine laws rests with the States, and has not been surrendered to the general government is settled in *Gibbons* v. *Ogden*. The source of this power is the acknowledged right of a State to provide for the health of its people, and although this power, when set in motion, may in a greater or less degree affect commerce, yet the laws passed in the exercise of the power, are not enacted for such an object. They are enacted for the sole purpose of preserving the public health, and if they injuriously affect commerce, Congress, under its power to regulate it, may control them. Of necessity they operate on vessels engaged in commerce, and may produce delay, or inconvenience, but they are still lawful when not opposed to any constitutional provision, or any act of Congress on the subject."

In *Sherlock* v. *Alling*, 93 U. S. 99; 103, Mr. Justice Field, in delivering the unanimous opinion of the court, said:

" In conferring upon Congress the regulation of commerce, it was never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country. Legislation in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it within the meaning of the Constitution."

Approved in *Kidd* v. *Peerson*, 128 U. S. at page 23, and *Nashville Railway* v. *Alabama*, 128 U. S. at page 101.

It was said in *Hall* v. *De Cuir*, 95 U. S. at page 488, as quoted with approval by that court in 128 U. S. at page 23:

" As has been often said, ' legislation (by a State) may in a great variety of ways affect commerce and persons engaged in it, without constituting a regulation of it within the

meaning of the Constitution,' unless under the guise of police regulations it impose a direct burden upon interstate commerce, or interferes directly with its function."

In *Railroad* v. *Heusen*, 95 U. S. 465, 470–1, it was said by Mr. Justice Strong:

"We admit that the deposit in Congress of the power to regulate foreign commerce and commerce among the States was not a surrender of that which may properly be denominated police power. What that power is, is difficult to define with sharp precision. It is generally said to extend to making regulations promotive of domestic order, morals, health, and safety."

In the same case, page 472, it is said:

"While we unhesitatingly admit that a State may pass sanitary laws and laws for the protection of life, liberty, health, or property within its borders; whilst it may prevent persons and animals suffering under contagious or infectious disorders, or convicts, &c., from entering the State; while for the purpose of self-protection it may establish quarantine, and reasonable inspection laws, it may not interfere with the transportation into or through the State beyond what is absolutely necessary for its self-protection. It may not, under the cover of exerting its police powers, substantially prohibit or burden either foreign or interstate commerce."

In the case of *Nashville, &c. Railway* v. *Alabama*, 128 U. S. 96, it was held that a State statute which requires locomotive engineers and other persons employed by a railroad company in a capacity which calls for the ability to distinguish and discriminate between color signals, to be examined in this respect from time to time by a tribunal established for that purpose, and which exacts a fee from the company for the source of examination, does not deprive the company of its property without due process of law; and so far as it affects interstate commerce, is within the competency of the State to enact, until Congress legislates on the subject.

And in that case the court cites (page 101), with approval, *Sherlock* v. *Alling*, 93 U. S. 99, 104, in which it was held that State legislation of that character "relating to the rights, duties, and liabilities of citizens, and only indirectly and remotely affecting the operations of commerce, is of obligatory force upon citizens within its territorial jurisdiction, whether on land or water, whether engaged in commerce, foreign or interstate, or in any other pursuit."

In *Kimmish* v. *Ball*, 129 U. S. 217, the court held that a statute of the State of Iowa which provided that any person having in his possession "Texas cattle," under certain circumstances, should be liable for damages which might accrue from allowing them to run at large and thereby spread the disease known as "Texas fever," was not in conflict with the commerce clause of the Constitution of the United States, although the necessary effect would be to interfere with the introduction into that State of the class of cattle to which the statute applied.

And the court, in referring to the case of *Railroad Co.* v. *Heusen*, 95 U. S. 465, in which the statute of Missouri, in a somewhat similar, though a much broader, statute, was held to be in violation of the interstate commerce clause of the Constitution, said that whilst that was true yet that the court in that case said:

"At the same time the court admitted unhesitatingly that a State may pass laws to prevent animals suffering from contagious or infectious diseases from entering within it."

In *Re Rahrer*, 140 U. S. 545, 554, Chief-Justice Fuller, in delivering the opinion of the court, said:

" The power of the State to impose restraints and burdens upon persons and property in conservation and promotion of the public health, good order, and prosperity, is a power originally and always belonging to the States, not surrendered by them to the General Government, nor directly restrained by the Constitution of the United States, and essentially exclu-

sive. And this court has uniformly recognized State legislation legitimately for police purposes as not in the sense of the Constitution necessarily infringing upon any right which has been confided expressly or by implication to the National Government."

In *Plumley* v. *Massachusetts*, 155 U. S. 461, 471, after discussing former decisions of the court, Mr. Justice Harlan, speaking for the court, said:

"While in each of those cases it was held the reserved police powers of the States could not control the prohibitions of the Federal Constitution, nor the powers of the government (*New Orleans Gas Light Co.* v. *Louisiana, &c. Mfg. Co.*, 115 U. S. 650), it was distinctly stated that the grant to Congress of authority to regulate foreign and interstate commerce did not involve a surrender by the States of their police powers. * * * * * * In none of the above cases is there to be found a suggestion or intimation that the Constitution of the United States took from the States the power of preventing deception or fraud in the sale, within their respective limits of articles in whatever State manufactured, or that the instrument secured to any one the privilege of committing a wrong against society."

In *United States* v. *E. C. Knight Co.*, 156 U. S. 1, 11, Chief-Justice Fuller said:

"It cannot be denied that the power of a State to protect the lives, health, and property of its citizens, and to preserve good order and the public morals, the power to govern man and things within the limits of its dominion, is a power originally and always belonging to the States, not surrendered by them to the General Government, nor directly restrained by the Constitution of the United States and essentially exclusive."

Again, at page 13, in the same opinion, he says:

"It is vital that the independence of the commercial power and of the police power, and the delimitation between them,

however sometimes perplexing, should always be recognized and observed; for while the one furnishes the strongest bond of union, the other is essential to the preservation of the autonomy of the States as required by our dual form of government."

We think from the decisions of the Supreme Court of the United States in the cases referred to above and others not cited, this conclusion may be drawn: that the State may, in order to secure and protect the lives or health of its citizens, or to preserve good order and the public morals, legislate for such purposes, in good faith and without discrimination against interstate or foreign commerce, without violating the commerce clause of the Constitution of the United States, although such legislation may sometimes touch in its exercise the line separating the respective domains of national and State authority, and to some extent affect foreign and interstate commerce.

Was the statute which we are considering passed in good faith for the purpose of protecting the health, and of preserving the morals of the people of the State?

The experience of mankind has shown the wisdom and necessity of having at stated intervals a day of rest for man and beast from their customary labors. It is necessary both for the physical and moral nature of man. The Government of the United States, as well as the government of the States of the Union, recognizes this requirement for rest in man's nature, and provides for it in their respective jurisdictions.

In *Ex parte Newman*, reported in 9 Cal. at page 519, Judge Field, now of the Supreme Court of the United States, in his dissenting opinion, which afterward became the law of that State (*Ex parte Andrews*, 18 Cal. 678), discussing the necessity and propriety of such a law with much force and learning, among other things, says:

" The Legislature, in the enactment of such a statute, has given the sanction of law to a rule of conduct which the en-

tire civilized world recognizes as essential to the physical and moral well-being of society.    Upon no subject is there such a concurrence of opinion among philosophers, moralists, and statesmen of all nations, as of the necessity of periodical cessations from labor.    One day in seven is the rule founded on experience, and sustained by science.    There is no nation possessing any degree of civilization where the rule is not observed, either from the sanctions of the law, or sanctions of religion.    This fact has not escaped the observation of men of science; and distinguished philosophers have not hesitated to pronounce the rule founded upon the law of our race. * * * Its aim is to prevent the physical and moral debility which springs from uninterrupted labor, and in this respect it is a beneficent and merciful law.    It gives one day to the poor and the dependent, from the enjoyment of which no capital or power is permitted to deprive them.    It is theirs for repose, for social intercourse, for moral culture, and, if they choose, for divine worship."

Judge Thurman, in *Bloom* v. *Richards*, 2 Ohio St., at page 391, says:

" Wisdom requires that men should refrain from labor at least one day in seven, and the advantages of having the day of rest fixed, and so fixed as to happen at regular recurring intervals, are too obvious to be overlooked."

The Supreme Court of the United States, in *Soon Hing* v. *Crowley*, 113 U. S. 703, 710, said:

"Laws setting aside Sunday as a day of rest are upheld not from any right of the government to legislate for the promotion of religious observances, but from its right to protect all persons from the physical and moral debasement which comes from uninterrupted labor.    Such laws have always been deemed beneficent and merciful laws, especially to the poor and dependent, to the laborers in our factories and workshops, and in the heated rooms of our cities; and

their validity has been sustained by the highest courts of the States."

" There can no longer be any question," says Mr. Cooley, " if any there ever was, that such (Sunday) laws may be supported as regulations of police." Cooley's Const. Lim. 725 (6th ed.), note 3 and cases cited.

It cannot be doubted that such laws are police regulations of the greatest utility for the physical and moral well-being of society. Neither is there any question that the statute under discussion was enacted in good faith for the preservation and protection of the health and morals of the people of this State, and without any discrimination whatever against interstate or foreign commerce, and that its only effect upon such commerce would be to delay it a few hours in its journey from the point of shipment to its destination. The statute provides for the uninterrupted shipment of articles of commerce of such a perishable character that one day's delay in their shipment would impair their value. There is nothing in the character of coal and other articles of commerce which are not injured by short delays, or in fact of any article of commerce, that requires that the laws of the State enacted and necessary for the preservation and promotion of the health and morals of its people should be struck down in order that they may have a more rapid shipment.

We are of opinion that the statute which the plaintiff company was indicted for violating is not in conflict with the commerce clause of the Constitution of the United States, that the judgment of the Circuit Court was right and should be affirmed, and the case between the same parties hereinbefore referred to, and reported in 88 Va. 95, in which a different conclusion was reached, was not correctly decided, and should be overruled.

Since this opinion was written the Supreme Court of the United States has decided that a statute of the State of Georgia,

similar to the one under consideration, was not in conflict with the commerce clause of the Constitution of the United States, but was a valid exercise of the police power of the State. *Hennington* v. *State of Georgia,* decided May 18, 1896.

BY THE REPORTER.

HARRISON, J., was present at the argument of this case, and when the opinion was prepared about six months before its delivery, took part in the conference, examined the opinion, and fully concurred therein, though absent when it was handed down.

*Affirmed.*