# �825𝔦𝔠𝔥𝔪𝔬𝔫𝔡.

## PIRKEY BROTHERS *v.* COMMONWEALTH.

### November 16, 1922.

1. SUNDAY—*Police Power—Sunday Law Valid as Exercise of the Police Power.*—The Virginia Sunday law (Code of 1919, section 4570) is a valid exercise of the police power of the State and constitutional.

2. SUNDAY—*Police Power—Sunday Law Valid as Exercise of the Police Power—Religious Freedom.*—While the constitutionality of the Sunday law (section 4570 of the Code of 1919) can be sustained as a valid exercise of the police power, its provisions cannot be enforced as a religious observance, as that is forbidden by the constitutional provision on the subject of religious freedom.

3. SUNDAY LAW—*Enforcement—Moral Fitness.*—While the provisions of the Sunday law cannot be enforced as a religious observance, the great moral force that is back of it will make itself felt in its enforcement in conformity with the views of that force. Issues of fact arising under the statute will have to be decided by juries who have been selected for their fitness for the service from the whole body of the people, and who, in this service, reflect the community opinion of moral fitness and propriety.

4. SUNDAY LAW—*Necessity—Meaning of "Necessity"—Construed with Reference to Present Conditions.*—The word "necessity" as used in the Sunday law (section 4570 of the Code of 1919), excepting works of necessity from the operation of the law, does not mean the same thing now as it did when the original act was passed in 1779. Many things that were deemed luxuries then, or had no existence at all, are now deemed necessaries. For example, street railways, telegraphs and telephones. The word is elastic and relative, and must be construed with reference to the conditions under which we live, and yet the elasticity must not be extended so far as to cover that which is not needful, but simply desirable, and thereby defeat the manifest purpose of the statute to set apart Sunday as a day of rest from ordinary labor.

5. SUNDAY LAW—*Meaning of "Necessity"—Physical Necessity or Moral Fitness—Governed by Circumstances of Particular Case.*—The "necessity," as that term is used in the Sunday law, excepting works of necessity from the operation of the statute (section 4570 of the Code of 1919), means not a physical and absolute necessity, but a moral

fitness or propriety of the work and labor done under the circumstances of each particular case. No fixed and unvarying definition of "necessity" as used in the statute can be given. What may be a necessity in one place may not be in another. Every case must stand on its own peculiar facts and circumstances.

6. Sunday Law—*Construction—Reasonable Construction.*—The Sunday law should have a reasonable construction so as to promote the end for which it was enacted, and thus cover every class of labor at every trade, calling, or business not excepted by the statute.

7. Sunday Law—*Necessity—Meaning of "Necessity."*—To escape the penalty pronounced by the statute, the labor performed must be of the class excepted by the statute, or recognized by the community as a necessity.

8. Sunday Law—*Necessity—Question of Law or Fact.*—What is or is not a necessity is generally a question of fact for the jury, and not one of law for the court. There are cases, however, where the question is one of law for the court. Where the act done is plainly a violation of the statute, as where a contractor, without emergency, is running a steam shovel on Sunday, or the act is plainly one of necessity, as where the owner lifts his ox out of the ditch, in either case, the question is one of law for the court. But if the act be one about which fair-minded men might reasonably differ as to whether or not it is a work of necessity, then it is a question of fact for the jury.

9. Sunday Law—*Violation a Crime—Presumptions and Burden of Proof.*—Formerly, a violation of the Sunday law was not made a crime, but simply entailed a forfeiture of an insignificant sum. But by section 4570, Code of 1919, a violation of the act is now made a criminal offense, and the same rules are applicable as to other criminal cases. The accused is presumed to be innocent until his guilt is established, and the burden is upon the Commonwealth to prove his guilt beyond a reasonable doubt. There is no burden on the accused to prove even by a preponderance of the evidence that the work done by him on Sunday was a work of "necessity or charity." If, upon the whole evidence in the case, both for the Commonwealth and the accused, the jury, after a careful and deliberate consideration of the evidence and arguments of counsel, and a full and free conference among themselves, honestly entertain a reasonable doubt as to the guilt of the accused, he cannot be rightfully convicted.

10. Sunday Law—*Keeping Open a Cave and Charging for Admission—Case at Bar.*—In the instant case defendants were charged with a violation of the Sunday law in keeping open a cave, charging admission fees of visitors, providing guides, and lighting the cave with electricity, on Sunday. The case was submitted to the Supreme Court of Appeals upon a verdict of guilty, accompanied by a certificate of facts. From these facts reasonably fair-minded men might draw different conclusions as to the ultimate fact to be ascertained, to-

wit, was the work done one of necessity in view of modern conditions of life? The Supreme Court of Appeals, however, did not feel warranted in interfering with the verdict of the jury, not being able to say that the verdict of the jury, approved by the trial court, was erroneous, and in such cases the Code of 1919, section 4937, requires an affirmation of the judgment.

Error to a judgment of the Circuit Court of Augusta county.

*Affirmed.*

The opinion states the case.

*Wm. V. Ford* and *Timberlake & Nelson*, for the plaintiffs in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile, Second Assistant Attorney-General,* for the Commonwealth.

BURKS, J., delivered the opinion of the court.

The plaintiffs in error were convicted of violating the Sunday law, and sentenced to pay a fine of $250.00. The case has been submitted to this court upon the following certificate of facts:

"The facts of this case, so far as they are material to be considered, are as follows:

"Weyer's Cave, or Grottoes of the Shenandoah, are situated in the northeast portion of Augusta county and are owned by the defendants, who in order to make them more attractive for tourists and others have installed electric lights and have advertised them extensively. They are kept open for tourists and others during the warm season of the year. Admission fees are charged by the defendants and have to be paid before those who desire to see them can enter. Guides were present to conduct parties through this cave. The ad-

vertisements set forth the fact that these caves are open for visitors on Sundays, and on Sundays, as a general proposition, the attendance was considerably larger than on other days. [To this some of the churches in this community objected and sent committees to the defendants to ask them to close on Sundays. This the defendants declined to do. Thereupon the warrant in this case was sued out.] On the Sunday charged in the warrant, visitors who paid admission fees entered this cave which was lighted up by electricity for the occasion.

"The cause came on to be heard, the jury returned a verdict of guilty, judgment was entered thereon and an appeal noted.

"It is agreed between counsel on both sides that this appeal shall be presented to the court of appeals to determine, under the foregoing facts, the simple question whether the keeping open of these caverns and admission to them of visitors on Sunday, constitute a violation of the statute commonly known as the 'Sunday observance law.' "

The statute under which the conviction was had is section 4570 of the Code, which is as follows:

"If a person on a Sunday be found laboring at any trade or calling, or employ his apprentices or servants in labor or other business, except in household or other work of necessity or charity, he shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not less than five dollars for each offense. Every day any person or servant or apprentice is so employed shall constitute a distinct offense and the court in which or the justice by whom any judgment of conviction is rendered may require of the person so convicted a recognizance in a penalty of not less than one hundred or more than five thousand dollars, with or without se-

curity, conditioned that such person shall be of good behavior, and especially to refrain from a repetition of such offense, for a period not exceeding twelve months. This section shall not apply to furnaces, kilns, plants and other business of like kind that may be necessary to be conducted on Sunday."

[1, 2] The constitutional validity of the statute has not been called in question, and we do not doubt that it is a valid exercise of the police power of the State. Its provisions, however, cannot be enforced as a religious observance, as that is forbidden by our laws on the subject of religious freedom. But from the creation of the State until the present time, this State has been recognized as a Christian State, at least in the sense that the great body of its citizens adhere to the tenets of the Christian religion, and, while at all times according freedom of conscience to all men, it has so far respected the opinions of this great body of its citizens as always to preserve from desecration the sanctity of Sunday which they regard as holy. The first declaration of religious freedom was on June 12, 1776 (1 Rev. Code 1819, p. 32, section 16), when it became a part of the bill of rights, and it has continued as a part of that bill until the present time, and is now section 16 of the present Constitution. Mr. Jefferson's great statute of religious freedom was enacted December 16, 1785, and has been retained in its original form in every revision of the laws from that time until now, and constitutes section 34 of the present Code. Code 1819, chapter 31, section 1; Code 1849, chapter 76, section 1; Code 1887, section 1394; Code 1919, section 34. The Sunday statute was enacted in 1779 (12 Hen. Stat. 336-7), after the adoption of the bill of rights, but before the adoption of Mr. Jefferson's statute of religious freedom, and has continued very nearly in its original form in every

revision of the laws from that time until now, and constitutes section 4570 of the present Code. [Code 1819, chapter 141, section 5, page 555; Code 1849, chapter 196, section 16; Code 1887, section 3799; Code 1919, section 4570.] So that it is seen that the two have never been regarded as in conflict with each other.

[The constitutional provision on the subject of religious freedom is as follows:

"That religion, or the duty which we owe to our Creator, and the manner of discharging it, can be directed only by reason and conviction, not by force or violence, and, therefore, all men are equally entitled to the free exercise of religion, according to the dictates of conscience, and that it is the mutual duty of all to practice Christian forbearance, love and charity towards each other."

The scope of the act of religious freedom may be gathered from its preamble and from the interpretation thereof in judicial decisions.

This act came under review by this court, in considering the admissibility to testify of a witness who did not believe in a future state of rewards and punishments, in *Perry's Case*, 3 Gratt. (44 Va.) 632, and it was there said:

"The progress of science and civilization, and the demands of commerce, have led to a relaxation of the rule; but it still retains a portion of its intolerant spirit; and the courts of justice in England, and in some of our sister States, have exercised an inquisitorial power over the religious belief of witnesses. In some of the States it has been relaxed or annulled by statutory and constitutional provisions. In Virginia, it was wholly abrogated by our Bill of Rights, and the act for securing religious freedom, subsequently engrafted in the amended Constitution, which wholly and permanently separated

'religion, or the duty which we owe to our Creator,' from our political and civil government; putting all religions on a footing of perfect equality; protecting all; imposing neither burdens nor civil incapacities upon any; conferring privileges upon none. Declaring, on the one hand, that 'no man or set of men are entitled to separate or exclusive privileges and emoluments from the community but in consideration of public services;' and on the other, that 'no person shall be enforced or otherwise restrained, molested or burdened in his body or goods, or otherwise suffer on account of his religious opinions and belief; but all men shall be free to profess, and by argument maintain, their opinions in matters of religion; and the same shall in no wise affect, diminish, or enlarge their *civil capacities*.'—'That religion, or the duty which we owe to our Creator, and the manner of discharging it, can be directed only by reason and conviction, and not by force and violence.' Placing the Christian religion where it stood in the days of its purity, before its alliance with the civil magistrate; when its votaries employed for its advancement no methods but such as are congenial to its nature; when, to use the language of the eloquent divine already quoted, its advocates, 'By the force of powerful arguments convinced the understandings of men; and by the charms of superior virtue captivated their hearts.' Proclaiming to all our citizens that henceforth their religious thoughts and conversation shall be as free as the air they breathe; that the law is of no sect in religion; has no high priest but justice. Declaring to the Christian and the Mohametan, the Jew and the Gentile, the Epicurean and the Platonist (if any such there be amongst us) that so long as they keep within its pale, all are equally objects of its protection; securing safety to the people, safety to the government, safety to religion; and (leaving

reason free to combat error) securing purity of faith and practice far more effectually than by clothing the ministers of religion with exclusive temporal privileges; and exposing them to the corrupting influence of wealth and power."

It will be observed from these declarations, that, while there was a fixed purpose to sever church and State, and to give the fullest freedom of conscience, and to abolish tithes and spiritual courts, there was no assault upon Christianity, or any other religious faith. Indeed the constitutional provision enjoins the exercise of *Christian* forbearance, love and charity. ] The framers of those laws knew then, as we know now, "that we are a Christian people, and the morality of the country is deeply engrafted upon Christianity," and freedom of religious opinion was never intended to set at naught and bring into contempt a religious observance held sacred by almost the whole body of the people. *The People* v. *Ruggles*, 8 John. (N. Y.) 290, 5 Am. Dec. 335, opinion by Chancellor Kent.

In *Holy Trinity Church* v. *United States*, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226, Mr. Justice Brewer points out that we are a Christian nation, and supports his argument by strong reasons and an array of authority. We may apply the same reasoning to this State.

The first charter granted to this State by King James I, in 1606, declares:

"We, greatly commending, and graciously accepting of, their desires for the furtherance of so noble a work, which may, by the Providence of Almighty God, hereafter tend to the glory of his Divine Majesty, in propagating of Christian religion to such people, as yet live in darkness and miserable ignorance of the true knowledge and worship of God, and may in time bring the

infidels and savages, living in those parts, to human civility, and to a settled and quiet government; Do, by these our letters-patent, graciously accept of, and agree to, their humble and well-intended desires."

The first declaration of rights by the people, in convention assembled, after severing their connection with the mother country, declared "that it is the mutual duty of all to practice Christian forbearance, love and charity towards each other" and that has continued till today to be a part of the fundamental law of the State. From 1779 until now labor, except household or other work of "necessity or charity" has been forbidden on Sunday, the day especially set apart by Christian people "for repose, for social intercourse, for moral culture, and, if they choose, for divine worship." In these, and in many other ways, has the legislature of the State recognized this as a Christian State. We may also say of the State what Mr. Justice Brewer said of the nation in *Holy Trinity Church* v. *United States,* 143 U. S. 457, 471, 12 Sup. Ct. 511, 516, 36 L. Ed. 226:

"If we pass beyond these matters to a view of American life as expressed by its laws, its business, its customs and its society, we find everywhere a clear recognition of the same truth. Among other matters note the following: The form of oath universally prevailing, concluding with an appeal to the Almighty; the custom of opening sessions of all deliberative bodies and most conventions with prayer; the prefatory words of all wills, 'In the name of God, amen;' the laws respecting the observance of the Sabbath, with the general cessation of all secular business, and the closing of courts, legislatures, and other similar public assemblies on that day; the churches and church organizations which abound in every city, town and hamlet; the multitude of charitable organizations existing everywhere under

46

Christian auspices; the gigantic missionary association, with general support, and aiming to establish Christian missions in every quarter of the globe. These, and many other matters which might be noticed, add a volume of unofficial declarations to the mass of organic utterances that this is a Christian nation."

[3] We may add that the brotherhood of man has been manifested by the people of this nation in recent years in a manner and to an extent hitherto undreamed of. Great researches have been maintained at enormous expense and personal sacrifices simply for the good of mankind. Fabulous sums have been gathered for the support of pure charities, and the wealth of the nation has been freely expended to relieve the suffering of others. These things, it is true, are not in the performance of the first and great commandment, but they are in furtherance of "the second, which is like unto it, thou shall love thy neighbor as thyself." While the provisions of the statute, therefore, cannot be enforced as a religious observance, the great moral force that is back of it will make itself felt in its enforcement in conformity with the views of that force. Issues of fact arising under the statute will have to be decided by juries who have been selected for their fitness for the service from the whole body of the people, and who, in this service, reflect the community opinion of moral fitness and propriety.

[4] We cannot, however, agree with the few courts that hold that the word "necessity" must be construed to mean the same thing now as it did when the original act was passed in 1779. Many things that were deemed luxuries then, or had no existence at all, are now deemed necessaries. For example, street railways, telegraphs and telephones. The word is elastic and relative, and must be construed with reference to the conditions un-

der which we live, and yet the elasticity must not be extended so far as to cover that which is not needful but simply desirable, and thereby defeat the manifest purpose of the statute to set apart Sunday as a day of rest from ordinary labor. *State* v. *James*, 81 S. C. 197, 62 S. E. 214, 18 L. R. A. (N. S.) 617, 128 Am. St. Rep. 902, 16 Ann. Cas. 277.

[5] In an early Massachusetts case (*Flagg* v. *Millbury*, 4 Cush. 243) it was said that the necessity meant was not a physical and absolute necessity, but a moral fitness or propriety of the work and labor done under the circumstances of each particular case, and it is said that this definition has been adopted in Alabama, Arkansas, Illinois, Indiana, Maine, Missouri, Pennsylvania, Texas, Vermont and West Virginia. For list of cases, see 37 Cyc. 552. If the Massachusetts court could have gone a step further and said what work was morally fit and proper to be done on Sunday it would have rendered an invaluable service, but this was impossible. The nature of the subject and the exigencies of society are such as to forbid it. No fixed and unvarying definition of "necessity" as used in the statute can be given. What may be a necessity in one place may not be in another. A Sunday excursion to the seaside or to the country in the hot summer months may be a necessity for the crowded population in the tenement houses of a large city, when it would not be for the inhabitants of a small town. Every case must stand on its own peculiar facts and circumstances.

The subject is still further complicated by the lack of harmony among Christian people as to what constitutes a proper observance of Sunday from a Christian standpoint. There is no concensus of opinion on the subject. There are those who adhere to the letter of the fourth commandment almost as strictly as did the

Jews in the beginning of the Christian era who were reproved for their misinterpretation of the law, while others are so lax in their interpretation as to do and to allow things on Sunday that to the conservative Christian population appear to be a desecration of the day. The courts, as a rule, have sought to protect and preserve the observance of Sunday as a civil institution, and as far as possible to enforce the spirit of the statutes. In *Norfolk & W. R. Co.* v. *Commonwealth*, 93 Va. 749, 761-3, 24 S. E. 837, 841 (34 L. R. A. 105, 57 Am. St. Rep. 827), in discussing the statute forbidding the running of freight trains on Sunday, it was said by this court:

"The experience of mankind has shown the wisdom and necessity of having at stated intervals a day of rest for man and beast from their customary labors. It is necessary both for the physical and moral nature of man. The Government of the United States, as well as the Government of the States of the Union, recognizes this requirement for rest in man's nature, and provides for it in their respective jurisdictions.

"In *Ex parte Newman*, reported in 9 Cal. at page 519, Judge Field, now of the Supreme Court of the United States, in his dissenting opinion, which afterwards became the law of that State (*Ex parte Andrews*, 18 Cal. 678), discussing the necessity and propriety of such a law with much force and learning, among other things, says:

" 'The legislature, in the enactment of such a statute, has given the sanction of law to a rule of conduct which the entire civilized world recognizes as essential to the physical and moral well-being of society. Upon no subject is there such a concurrence of opinion among philosophers, moralists, and statesmen of all nations, as of the necessity of periodical cessations from labor.

One day in seven is the rule founded on experience, and sustained by science. There is no nation possessing any degree of civilization where the rule is not observed, either from the sanctions of the law, or sanctions of religion. This fact has not escaped the observations of men of science; and distinguished philosophers have not hesitated to pronounce the rule founded upon the law of our race. * * * Its aim is to prevent the physical and moral debility which springs from uninterrupted labor, and in this respect it is a beneficent and merciful law. It gives one day to the poor and the dependent, from the enjoyment of which no capital or power is permitted to deprive them. It is theirs for repose, for social intercourse, for moral culture, and, if they choose, for divine worship.'

"Judge Thurman, in *Bloom* v. *Richards*, 2 Ohio St., at page 391, says:

" 'Wisdom requires that men should refrain from labor at least one day in seven, and. the advantages of having the day of rest fixed, and so fixed as to happen at regular recurring intervals, are too obvious to be overlooked.'

"The Supreme Court of the United States, in *Soon Hing* v. *Crowley*, 113 U. S. 703, 710, 5 S. Ct. 730, said:

" 'Laws setting aside Sunday as a day of rest are upheld not from any right of the government to legislate for the promotion of religious observance, but from its right to protect all persons from the physical and moral debasement which comes from uninterrupted labor. Such laws have always been deemed beneficent and merciful laws, especially to the poor and dependent, to the laborers in our factories and workshops, and in the heated rooms of our cities; and their validity has been sustained by the highest courts of the States.' "

[6-8] These expressions, however, while clearly con-

demning labor on Sunday, and advocating the observance of the day as a day of rest, convey but little idea of how that rest is to be taken. The courts have held many things to be works of necessity under existing conditions of society, and have condemned many more, but have been unable to formulate any rule of universal application. 37 Cyc. 552, *et seq;* 25 R. C. L. pp. 1418-1423. Under these circumstances, with no fixed rule for our guidance, we find no other course to pursue than to apply to the statute the same rules of construction that are applied to other statutes. The statute should have a reasonable construction so as to promote the end for which it was enacted, and thus cover every class of labor at every trade, calling or other business not excepted by the statute. The statute should also be construed in the light of the age in which we live, recognizing the fact that there are things which the community regard as necessary that were not necessities when the statute was first enacted; that, to escape the penalty pronounced by the statute, the labor performed must be of the class excepted by the statute, or recognized by the community as a necessity, and that what is or is not a necessity is generally a question of fact for the jury and not one of law for the court. There are cases where the question is one of law for the court. Where the act done is plainly a violation of the statute, as where a contractor, without emergency, is running a steam shovel on Sunday, or the act is plainly one of necessity, as where the owner lifts his ox out of the ditch; in either case, the question is one of law for the court. But if the act be one about which fair-minded men might reasonably differ as to whether or not it is a work of necessity, then it is a question of fact for the jury. If it be objected that this leaves the question unsettled, with nothing for future guidance, and that different juries

may reach different results on the same evidence, we can only reply that this is true of all questions of fact, and is especially noticeable in criminal cases ·and cases involving questions of negligence.

In *State* v. *Schatt*, 128 Mo. App. 622, 107 S. W. 10; L. R. A. 1917-B, 97, the Missouri Court of Appeals, after reviewing the authorities, says:

" * * * It is after all a matter to be determined on principle, and ·when viewed from this standpoint, should be treated, of course, precisely as all other matters of the same nature. Now on principle, the question. essentially resolves to this: First, if the proposition be clear that the particular act of labor performed is one of necessity; that is to say, if the labor is so clearly a work·of necessity that no two reasonable minds would differ thereabout; the court may treat it as a matter of law, identically as in other cases, and under such circumstances, no doubt would be justified in so declaring. Second, on the other hand, if the question is one about which reasonable minds might well differ, it is then essentially one of fact, and as such, within the province of the jury. And third, if the proof is so clear that no two reasonable minds could differ on the proposition, that no possible element of necessity whatever entered into the particular act of labor performed, then the court may, as a matter of law, treat the case as falling within the penalties, and not within the exception to the statute as one of necessity or charity."

The editor of the note to L. R. A. 1917-B, at p. 97, approves of the conclusion of the court. See also, in support of the view that the question is one for the jury, *Ungericht* v. *State*, 119 Ind. 379, 21 N. E. 1082; 12 Am. St. Rep. 419.

In *State* v. *McBee*, 52 W. Va. 257, 43 S. E. 121, 60 L. R. A. 638, the question was whether or not the Sunday

law was violated by pumping an oil well on Sunday—
whether or not it was a work of necessity—the court
said:

"In the case at bar there was evidence tending to
show that there was no damage or loss by shutting down
the well on Sunday, while on the other hand there was
evidence tending to show that such shutting down
would not only result in loss of production of oil but
permanent injury to the well. The question was purely
a question for the jury. It was their province to weigh
the testimony and say whether the work complained of
was a work of necessity."

In reviewing the statute forbidding labor on Sunday
it has been said that the language used seems to be di-
rected mainly against manual labor, or the conduct of
business of like nature, and for the reason that it might
offend the sensibilities of the community which believed
in a strict observance of the sanctity of the day. For
instance, in 6 Va. Law Reg. 692, it is said:

"The language of the Virginia statute seems directed
toward the prevention of manual labor, or the conduct
of business of such a nature, and in such open and no-
torious manner, as to disturb the tranquility of the Sab-
bath, or offend the religious sensibilities of the com-
munity, and bring the Sabbath day into contempt. The
language is, if any person 'be found'—indicating a pub-
lic display of his contempt for the sanctity of the day;
and, further, be found 'laboring'—suggesting manual
labor, rather than intellectual or other employment;
again, laboring at any 'trade or calling'—the latter
seeming to exclude isolated transactions, and scarcely
suggesting pursuits higher than manual occupations, or
at least those which can only be conducted in a public
manner. True, servants and apprentices are by this
statute forbidden to engage '*in any business,*' but under

the rule of *ejusdem generis*, this may fairly be confined to things of the same kind with those prohibited to the master. See *Pete* v. *Dicken, supra* [1 Cr. M. & R. (1 Exch.) 421, 427], where Baron Parke expressed the conviction that the English statute prohibiting any 'tradesman, artificer, workman, *or any person whatsoever*,' from laboring on Sunday, did not apply to attorneys, but that the clause 'any person whatsoever' should be confined, under the rule of *ejusdem generis*, to persons of a like kind with those expressly named.'' But that question is not before us, and we do not wish to be understood as expressing any opinion upon it.

[9] Furthermore, the violation of the statute was not made a crime, but simply entailed a forfeiture of an insignificant sum, for over a century and a quarter after its first enactment. Under the statute of 1779, carried into the Code 1819, the forfeiture was $1.67 for each offense; under the Codes of 1849 and 1887, the forfeiture was $2.00. In June, 1907, this court deciced the case of *Wells* v. *Commonwealth,* 107 Va. 834, 57 S. E. 588, in which there was involved the question, whether or not the violation of the statute was a criminal offense, and the court decided that it was not, by a vote of three to two. At the next succeeding session of the legislature, and it may be presumed in consequence of the decision in the *Wells Case,* the legislature changed the phraseology of the statute so as to declare that it should be a misdemeanor punished by a fine of not less than $5.00. Acts 1908, p. 258. The act of 1908, without alteration in this respect, was carried into the Code of 1919 as section 4570, under which this prosecution was set on foot. No reason has been suggested, or occurs to us, why the change of 1908 was made except the decision in the *Wells Case,* and for the purpose of making statutory the holding of the minority of the court in

that case.   We have no evidence of any great change
at that time of the religious sentiment of the State.
But the change made in the statute was a radical one.
The violation of the statute has now been made a crim-
inal offense, and we must apply to it the same rules as
to other criminal cases.   The accused is presumed to
be innocent until his guilt is established, and the burden
is upon the Commonwealth to prove his guilt beyond a
reasonable doubt.   There is no burden on the accused
to prove even by a preponderance of the evidence that
the work done by him on Sunday was a work of "ne-
cessity or charity."   If, upon the whole evidence in the
case, both for the Commonwealth and the accused, the
jury, after a careful and deliberate consideration of the
evidence and arguments of counsel, and a full and free
conference among themselves, honestly entertain a
reasonable doubt as to the guilt of the accused, he can-
not be rightfully convicted.   *Sims Case, post* p. 736, 115
S. E. 382, decided today.   The burden is on the Com-
monwealth to prove every element of the offense.

The courts are divided as to the necessity of negativ-
ing, in the indictment or other charge, the fact that the
work was one of necessity, but we need not pass on that
question as the proper allegation was made in the war-
rant on which defendants were tried.   See Beale's Crim.
Pl. & Pr. sec. 199 and 37 Cyc. 578 and cases cited.]

[10] The case at bar stands before us in an anomalous
position.   It is not the case of a verdict founded upon
doubtful evidence, or conflicting testimony, but the ver-
dict of a jury, accompanied by a certificate of facts.
From these facts, however, reasonably fair-minded men
might draw different conclusions as to the ultimate fact
to be ascertained, to-wit, was the work done one of neces-
sity in view of modern conditions of life.   Under these
circumstances we do not feel warranted in interfering

with the verdict of the jury. [We are unable to say that the verdict of the jury, approved by the trial court, is erroneous, and in such case the statute requires us to affirm the judgment of the trial court. Code section 4937.

*Affirmed.*