# Richmond

## WILLIAM JONES AND GEORGE PATRICK v. COMMONWEALTH OF VIRGINIA.

June 10, 1946.

Record No. 3092.

Present, All the Justices.

The opinion states the case.

*George M. Warren*, for the plaintiffs in error.

*Abram P. Staples, Attorney General,* and *V. P. Randolph, Jr., Assistant Attorney General,* for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

Upon separate petitions filed by a probation officer, the defendants, William Jones and George Patrick, infants under the age of eighteen years, respectively ————— years and fifteen years, were summoned to appear before the Juvenile and Domestic Relations Court of the city of Bristol, Virginia, to answer complaints that they were delinquent children within the meaning of chapter 78, Virginia Code, 1942 (Michie).

Upon trial, the Juvenile and Domestic Relations Court found each of them guilty of throwing stones at a dwelling in the night time. Separate judgments were entered declaring each a delinquent child. They were placed under the supervision of a probation officer, but allowed to remain in the care and custody of their parents. "As punishment for the offense committed," it was ordered that each defendant pay a fine of $25 and $3 costs out of their own individual earnings at gainful employment.

In each judgment there were seven additional conditions of probation imposed, depriving the defendants of certain normal privileges and rights for one year. One directed that they be at home each evening by nine-thirty and remain there the rest of the night, unless escorted from the home by an adult. A second deprived them of the right to drive an automobile or motor vehicle for pleasure. Another ordered that each boy "attend Sunday School and Church each Sunday hereafter for a period of one year, and present satisfactory evidence of such attendance at the conclusion of each month to the Probation Officer."

Appeals were taken to the Corporation Court of Bristol, where, by agreement, trial by jury being waived, the cases were tried together and heard on the same evidence before the judge. Upon this trial, the judgments of the Juvenile and Domestic Relations Court were affirmed in all respects. The

same fines and the same conditions of probation were imposed on the defendants. Hence, this appeal.

The defendants contend that the judgments are without evidence to support them, and that they are illegal, unreasonable, and contrary to public policy, and in violation of the laws of Virginia and of the Federal and State Constitutions.

The material evidence in the cases may be summarized as follows:

Mrs. Edith Reed testified that she lived in a one-story house fronting on West Mary street, Bristol (an humble section of the city occupied by white and colored residents). The rear of her lot was vacant and ran back to Piedmont street. On the vacant portion of the lot, near her bedroom window, was located a metal sign of some kind, a billboard or signboard, placed at an angle to Piedmont street. About eight-thirty o'clock on Friday night, March 2, 1945, she heard some rocks hitting the rear of her house. She looked out of her window and saw a boy a short distance therefrom, wearing white and tan slippers, standing in front of the billboard. The boy ran to a street light on Piedmont street, and three more boys came from behind the billboard to join him. She holloed to them, pleading that no more rocks be thrown or she would call the police. While the first boy was running to the light more rocks were thrown toward her by some unseen person or persons. She thought these rocks came from behind the billboard. She only saw four boys. One of the four wore a green sweater. She did not actually see any of these boys throw a rock or stoop down to get a rock. She called the police.

Mrs. Belle Justice testified that she came to the house of her mother, Mrs. Reed, just as some rocks were being thrown. She heard her mother tell a boy not to peep in her window. She thought this boy had on white and tan shoes; but she did not see his shoes until he had gotten on Piedmont street. She also saw three other boys come from behind the billboard and a girl who subsequently joined the four boys under the street light. One boy had on a green

sweater and another wore a jacket. She did not see any one throw a rock.

Much of the above evidence of the two witnesses is taken from the whole of their testimony, which is vague and confused in some respects and contradictory in others.

Another witness for the Commonwealth, Ella Hardy, who lived in the immediate neighborhood, heard some one throwing rocks, either against the billboard or near the house of Mrs. Reed. She raised her window and saw a boy with white and tan shoes, accompanied by a boy wearing a brown jacket, both on the sidewalk of Piedmont street, near the hedge close to the lot of Pearl Roberts. Subsequently two other boys came along and joined the first two under the street light. Some rocks were thrown by some unseen person while the boy in the white shoes was within her vision. Subsequently a boy and girl joined the other four boys under the light. She stated positively that none of the boys threw a rock while she looked, and that neither of the defendants raised his hands, although rocks were then being thrown by some one else.

Pearl Roberts heard Ella Hardy call out that some rocks were being thrown. She looked out of her window and saw a boy with white shoes and another boy with a jacket "about the color of a felt mattress." She then observed four boys come down the street and stop under the street light, where they were joined later by a girl and another boy. They stood there talking for two or three minutes, and then went on their respective ways. She further stated that when she saw the boys none of them was engaged in throwing rocks. She went upstairs after Ella Hardy told her that the boys they saw were not doing anything.

The evidence of the defendants' witnesses was as follows:

At the time of the rock-throwing episode, William Jones and George Patrick, in company with Allan Clark and Guy Fuller, Jr., were walking down Piedmont street, on their direct route to a moving picture show. The four boys, all high school students, had been on an automobile ride, and

had just gotten out of the automobile on Euclid avenue. Jones and Patrick walked in front. About twenty-five feet behind them were Clark and Fuller. Walking behind the latter, about twenty or twenty-five feet distant, were two other high school students, Richard McKenzie and Miss Dolly Sopigoti. When the defendants reached the hedge that separated the property of Pearl Roberts from the vacant lot of Mrs. Reed, upon which is located the billboard, the four boys heard the rocks being thrown. Some one called out in protest, but they did not know what was said. Patrick immediately ran down to a street light at the next corner. He was followed by Jones, who hastened to join him under the street light. Both defendants heard some rocks thrown after they started towards the street light. Clark and Fuller heard the rocks in both instances as they came up and joined the first two boys. They were followed to the same place by McKenzie and Miss Sopigoti. Standing together they speculated among themselves as to what had happened, and who had thrown the stones. After exchanging a few words, they separated, McKenzie and Miss Sopigoti proceeding to one theater and the four boys to another. The four boys walked down Piedmont street towards Scott street. A police car passed them going towards the Roberts' home. When the defendants and the two boys had reached Scott street, the police car turned around and came back, and the police officers took the boys into custody and carried them to the scene of the rock-throwing.

William Jones wore a tan jacket, and George Patrick had on white and tan shoes. Guy Fuller, Jr., wore a green sweater.

When the four boys were brought before Mrs. Reed and Mrs. Justice, they undertook to identify Patrick as the boy they saw wearing the white and tan shoes, Guy Fuller, Jr., as the lad with the green sweater, and Jones as the wearer of the brown jacket.

The defendants testified that they did not leave the sidewalk of Piedmont street. They denied positively that either of them threw a single rock. The other three boys and the

young miss testified that the defendants were in full view during their entire passage down Piedmont street, and that neither one of the defendants, nor any one in the party of the six young persons, threw a rock. All six of these witnesses were acquainted with each other, (being students in the same high school) but they were in no wise engaged in the same enterprise or occupation on the night of March 2nd.

The evidence further discloses that there were other persons traveling Piedmont street that night about the time in question. On the far side of that street, opposite the home of Mrs. Reed, there is a high bank, from which rocks could have been thrown by an unseen person. This was actually suggested by McKenzie in the conversation which he had with the defendants under the street light.

The testimony of the police officers related only to what they were told by the witnesses for the Commonwealth.

The testimony of each of the defendants and their witnesses was direct, straightforward, and positive. The action of Jones and Patrick in proceeding directly to the most exposed place for discovery, under a street light, after the rocks had been thrown, is not indicative of any sense of guilt on their part. Further opposed to the inference of their guilt, drawn from the description of their clothes, is the positive evidence of their innocence.

Eleven character witnesses, among them leading and prominent citizens of Bristol and neighbors of the defendants, testified positively that each of the defendants bore a good reputation for truth and veracity.

The judgment against a youth that he is delinquent is a serious reflection upon his character and habits. The stain against him is not removed merely because the statute says no judgment in this particular proceeding shall be deemed a conviction for crime or so considered. The stigma of conviction will reflect upon him for life. It hurts his self-respect. It may, at some inopportune, unfortunate moment, rear its ugly head to destroy his opportunity for advancement, and blast his ambition to build up a character

and reputation entitling him to the esteem and respect of his fellow man. Nor is the implication that he has wilfully sworn to a falsehood to prevent conviction to be disregarded lightly. Guilt should be proven by evidence which leaves no reasonable doubt. Inferences must give way when in conflict with facts established by positive proof.

The provisions of chapter 78, Virginia Code, 1942 (Michie), sections 1905-1922, are protective, not penal. Proceedings thereunder are of a civil nature, not criminal. They are intended for the protection of the child and society, to save the child from evil tendencies and bad surroundings, and to give it more efficient care and training that it may become a worthy and useful member of society.

Mr. Justice Hudgins in *Mickens* v. *Commonwealth*, 178 Va. 273, 279, 16 S. E. (2d) 641, succinctly stated the powers of the juvenile courts under chapter 78. Said he:

"No power is given to the juvenile courts to convict any child of any crime, either misdemeanor or felony, or to commit any child to any penal institution. Such court may only adjudge a child a delinquent and commit him, not to a penal institution, but to the State Board of Public Welfare, which board is given power to make proper disposition of the child. Sec. 1910.

"It is thus seen that the matters over which the juvenile courts are given exclusive original jurisdiction are the 'disposition, custody or control of delinquent, dependent or neglected children,' but not their trial and punishment for the offense which they have committed.

"The trial and punishment of minor offenders follows the regular criminal procedure, modified, in certain respects, by the statutes setting up juvenile and domestic relations courts. These statutes have established a system whereby most juvenile offenders are first subjected to the jurisdiction of the juvenile courts for proceedings therein designed to subject such offenders to the supervision and control of the State in a manner in which the delinquent ways of the child will be corrected and he be made to lead a correct life."

In view of what we have said, it is unnecessary to discuss the severity of the punishment for the supposed offense of the two infants.

The statute, section 1922, provides that it "shall be liberally construed in order to accomplish the beneficial purposes herein set forth." There is nothing in the record to suggest that the accused were inherently vicious or incorrigible. To classify an infant as delinquent because of a youthful prank, or for a mere single violation of a misdemeanor statute or municipal ordinance, not immoral *per se*, in this day of numberless laws and ordinances is offensive to our sense of justice and to the intendment of the law. We cannot reconcile ourselves to the thought that the incautious violation of a motor vehicle traffic law, a single act of truancy or a departure from an established rule of similar slight gravity, is sufficient to justify the classification of the offender as a "delinquent," and require the supervision of a probation officer. We can but reflect that if this were so, there would be an inclusion of so many in the classification that the word would lose its accepted meaning.

The next question is whether the requirement in the judgments that the defendants "attend Sunday School and Church each Sunday" for the period of a year violates their Constitutional guaranty of religious freedom.

Nothing is more fully set forth or more plainly expressed than the determination of our forefathers to establish and perpetuate in the several States of the Union complete religious liberty. No State has more jealously guarded and preserved the questions of religious belief and religious worship as questions between each individual man and his Maker than Virginia. See *Pirkey Bros.* v. *Commonwealth*, 134 Va. 713, 114 S. E. 764, 29 A. L. R. 1290.

The Virginia Bill of Rights, adopted June 12, 1776, contains the first declaration of the people of Virginia, in convention assembled, relating to religious freedom. With language unchanged, it became, and is now, section 16 of the Constitution of Virginia.

"16. That religion, or the duty which we owe to our Creator, and the manner of discharging it, can be directed only by reason and conviction, not by force or violence; and therefore all men are equally entitled to the free exercise of religion, according to the dictates of conscience; and that it is the mutual duty of all to practise Christian forbearance, love, and charity towards each other."

Jefferson's great statute of Religious Freedom, enacted December 16, 1785, retained in its original form in every revision of the laws from that time until now, constitutes section 34 of our Code, again declared and re-affirmed in section 35.

The preamble of this statute, after recognizing religion, morality, and knowledge as essential to good government and to the happiness of the people, proceeds to declare and proclaim:

"That no man shall be compelled to frequent or support any religious worship, place or ministry whatsoever, nor shall be enforced, restrained, molested or burthened, in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief; but that all men shall be free to profess, and by argument to maintain, their opinions in matters of religion, and that the same bill shall in no wise diminish, enlarge or affect their civil capacities."

This language, unchanged, has been incorporated as a part of our present Constitution, section 58.

The first amendment to the Constitution of the United States provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; * * * ."

██ ██ Thus, in these statutes and constitutional provisions are contained the fundamental principles of the separation of church and state. There is preserved and assured to each individual the right to determine for himself all questions which relate to his relation with the Creator of the Universe. No civil authority has the right to require any one to accept or reject any religious belief or to contribute any support

thereto. The growth of religion is not made dependent on force or alliance with the state. Its support is left to moral and spiritual forces.

Mr. Cooley in his great work on Constitutional Limitations, Eighth Edition, Volume Two, page 968, forcefully states the compelling reasons for our statutes and constitutional provisions.

"Whoever is not led by choice or a sense of duty to attend upon the ordinances of religion is not to be compelled to do so by the State. It is the province of the State to enforce as far as it may be found practicable, the obligations and duties which the citizen may be under or may owe to his fellow-citizens or to society; but those which spring from the relations between himself and his Maker are to be enforced by the admonitions of the conscience, and not by the penalties of human laws. Indeed, as all real worship must essentially and necessarily consist in the free-will offering of adoration and gratitude by the creature to the Creator, human laws are obviously inadequate to incite or compel those internal and voluntary emotions which shall induce it, and human penalties at most could only enforce the observance of idle ceremonies, which, when unwillingly performed, are alike valueless to the participants and devoid of all the elements of true worship."

For the foregoing reasons, we are of opinion to reverse and annul each of the judgments complained of, and to dismiss the proceedings against each of the defendants.

*Reversed and proceedings dismissed.*