In the Matter of Robert R. Urbasek, Alleged Delinquent Boy.

Robert F. Urbasek, by His Mother and Next Friend, Lorraine Urbasek, Respondent-Appellant, v. People of the State of Illinois, Petitioner-Appellee.

Gen. No. 51,004.

First District, First Division.

October 31, 1966.

Rehearing denied November 29, 1966.

Edward F. Vyzral and Herman R. Tavins, of Chicago, for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and William J. Nellis, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

Robert F. Urbasek, an eleven-year-old boy, was found to be a delinquent by the Juvenile Division of the Circuit Court of Cook County on October 1, 1965. The petition alleging delinquency charged that he did "violate a State law." At the hearing, evidence was introduced of the murder of an eleven-year-old girl with whom he had been playing approximately four hours prior to the discovery

of her body. The finding of delinquency was based on the use of the "preponderance of the evidence rule."

On appeal, the principal questions are: (1) Where the hearing and determination of delinquency were prior to the effective date of the present Juvenile Court Act, should the proceedings have been governed by the "preponderance of the evidence rule" or by the "beyond a reasonable doubt rule," since personal liberty was at stake? (2) Was the delinquent entitled to all the constitutional safeguards possessed by adults exposed to criminal prosecution? (3) May an expert witness on direct examination be questioned about learned treatises on which he is not specifically relying? (4) Was there an illegal search and seizure and, if so, was the right to suppress the fruits thereof waived?

On August 26, 1965, between 7:00 and 8:00 p. m., the body of Karen Mitchell was found in the locked Urbasek garage. Karen had been missing since about 3:00 p. m., and her mother had been searching for her. She had questioned Robert several times and finally insisted that Robert and his older sister allow her to look for Karen in their garage. The garage was opened, and the girl's body, with seven stab wounds, was found in the crawl space at the far end of the garage. A 6-inch knife was found near her head, and on her left wrist was "a strapping with perforated holes and a combination lock and a piece of twinelike substance around her neck." The immediate cause of death was stab wounds of the lungs and liver. Karen's mother testified as to what happened when she found the body: "I saw Karen's knees. I looked, and I said, 'There she is, Bobby. . . . Why did you do it?' He said, 'I don't know.' "

Later that evening, Robert was questioned both at home and at the Village of LaGrange police headquarters. The record indicates that Edward F. Vyzral, an attorney, was present during part of the questioning at the police

station, and that he represented Robert at the court hearing. Robert cooperated with the police and answered all questions. He denied seeing Karen after 3:20 p. m., when "she went around the side of the house" while he was filling a lawn mower with gasoline.

A State's witness, a Chicago Police Department microanalyst, testified that he made an examination of a sample of the decedent's blood, which he received from the morgue, and determined that "it was human blood, Group A." He also examined reddish brown stains on the knife and on Robert's T-shirt and found they were "human blood of Group A." One strand of hair found in the hand of the decedent was compared with hair strands submitted from the head of Robert, and a comparison determined that both hairs were similar. On the one strand was found a reddish brown flake, which was found to be blood. He also testified, "I found nothing on the boy's socks, nothing on his undershirt. I found nothing on his undershorts, they were clean. The fingernail scrapings were negative. There were no fingerprints on the knife, there were no fingerprints on the strap iron, there were no fingerprints on the lock, there were no fingerprints on the tape or the rope."

Robert testified and was cross-examined extensively at the hearing. His testimony was substantially the same as related by the various police officers who had questioned him on the day of the occurrence. He denied killing Karen and was steadfast in his statement that he did not see her after she left him at 3:20 in the afternoon.

The trial court, in announcing its findings, remarked: "I was and am convinced that the youngster committed the act. I believe that the State met their burden of establishing the preponderance of evidence. I don't know that they met, if it is a requirement of proof beyond a reasonable doubt. I don't think that was met. . . . Since I have entered the finding of delinquency, and since I was convinced he was and I am convinced the youngster

378

committed the act, I have felt that long term placement was in need."

Initially, we consider whether at the hearing on the delinquency petition, the court should have required proof beyond a reasonable doubt that Robert murdered Karen, which was the basis of the charge and finding of his delinquency.

The authorities submitted by respondent include In re Madik, 233 App Div 12, 251 NYS 765, where the charge of delinquency was based on arson, and the court said (p 767):

> "In the case of an adult, proof of guilt beyond a reasonable doubt would be required. The district attorney concedes and we think that such proof is required here.
>
> "Undoubtedly suspicion points to the boy's guilt, but suspicion is not proof beyond a reasonable doubt, and we think that the boy's guilt has not been sufficiently shown under the rule."

In In re James Rich, 86 NYS2d 308, the charge of delinquency was that the minor was responsible for the death of another person. There the court said (p 311):

> "The rule of law is that a charge of crime must be established beyond a reasonable doubt. If there is a reasonable doubt as to the perpetration of the crime, that reasonable doubt must be resolved in favor of the person charged with having committed the act. It is no less applicable to a child than it is to an adult."

In Jones v. Commonwealth, 185 Va 335, 38 SE2d 444, the court said (p 447):

> "Guilt should be proven by evidence which leaves no reasonable doubt. Inferences must give way when in conflict with facts established by positive proof."

379

Also cited is an article entitled "Constitutional Rights in Juvenile Courts," 46 Cornell Law Quarterly 387, where it is said (p 412):

> "Due process of law demands that the particular misbehavior alleged to constitute juvenile delinquency be proved beyond a reasonable doubt. Some courts have settled for the quantum of proof used in civil litigation, that is, proof by a preponderance of the evidence. Not only must the offense be clearly proved, but it must be proved, according to the weight of authority, by good and competent evidence with true probative value . . . .
>
> "A child before a juvenile court, alleged to have committed particular wrongs, is entitled to the presumption of innocence accorded by the law to inveterate adult wrongdoers . . . ."

The State argues, "The standard of proof for delinquency hearings after December 31, 1965 has been and remains '. . . a preponderance of the evidence . . . .' Ill Rev Stats 1965, ch 37, par 701–4. That provision of the Juvenile Court Act merely codified the earlier procedural gauge, said to be '. . . the manifest weight of the evidence . . .' in In re Johnson v. Johnson, 30 Ill App2d 439, 444 (4th District)."

The State concedes "occasional suggestions of a *reasonable doubt* standard are discoverable in New York . . . , but the established standard throughout New York is a *preponderance.*"

Other authorities examined by this court include "Standards for Juvenile and Family Courts," issued by the U. S. Department of Health, Education and Welfare, Children's Bureau Publication Number 437–1966, where it is said (p 72):

> "Since delinquency proceedings are noncriminal in nature, the majority position holds they should be

380

governed by the preponderance of the evidence rule. The minority position holds that beyond a reasonable doubt should apply since personal liberty is at stake and the imposition of criminal sanctions may be the ultimate result. A recommendation, which represents a middle of the road position, namely, the requirement of 'clear and convincing' proof appears to be a reasonable compromise and is endorsed. . . . Only evidence which is competent material and relevant under the rules applicable to civil cases should be admitted."

In a recent opinion of the United States Supreme Court, Kent v. United States, 383 US 541, 544 (1966), where the court was concerned with whether the Juvenile Court judge properly waived jurisdiction of the petitioner and directed that he be "held for trial for [the alleged] offenses under the regular procedure of the U. S. District Court for the District of Columbia," Mr. Justice Fortas discussed the purpose of Juvenile Courts and the theory that their proceedings are designated as civil rather than criminal, and said:

"1.  . . . The Juvenile Court is theoretically engaged in determining the needs of the child and of society rather than adjudicating criminal conduct. The objectives are to provide measures of guidance and rehabilitation for the child and protection for society, not to fix criminal responsibility, guilt and punishment. The State is parens patriae rather than prosecuting attorney and judge. But the admonition to function in a 'parental' relationship is not an invitation to procedural arbitrariness.
"2.  Because the State is supposed to proceed in respect of the child proceeding as parens patriae and not as adversary, courts have relied on the premise that the proceedings are 'civil' in nature and not criminal, and have asserted that the child

381

cannot complain of the deprivation of important rights available in criminal cases. It has been asserted that he can claim only the fundamental due process right to fair treatment. For example, it has been held that he is not entitled to bail; to indictment by grand jury; to a speedy and public trial; to trial by jury; to immunity against self-incrimination; to confrontation of his accusers; and in some jurisdictions (but not in the District of Columbia, see Shioutakon v. District of Columbia, 98 US App DC 371, 236 F2d 666 (1956), and Black v. United States, supra) that he is not entitled to counsel.

"While there can be no doubt of the original laudable purpose of juvenile courts, studies and critiques in recent years raise serious questions as to whether actual performance measures well enough against theoretical purpose to make tolerable the immunity of the process from the reach of constitutional guaranties applicable to adults. There is much evidence that some juvenile courts, including that of the District of Columbia, lack the personnel, facilities and techniques to perform adequately as representatives of the State in a parens patriae capacity, at least with respect to children charged with law violation. There is evidence, in fact, that there may be grounds for concern that the child receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children.

"This concern, however, does not induce us in this case to accept the invitation to rule that constitutional guaranties which would be applicable to adults charged with serious offenses for which Kent was tried must be applied in juvenile court proceedings concerned with allegations of law violation. The Juvenile Court Act and the decisions of the United States Court of Appeals for the District of

Columbia provide an adequate basis for decision of this case, and we go no further.

"3. . . .

"We do not mean by this to indicate that the hearing to be held must conform with all of the requirements of a criminal trial or even of the usual administrative hearing; but we do hold that the hearing must measure up to the essentials of due process and fair treatment. Pee v. United States, 107 US App DC 47, 50, 274 F2d 556, 559 (1959)."

The foregoing authorities indicate that there are well grounded reasons for the application of either standard of proof where the charge of delinquency is based on a single criminal act, such as murder.

■ After much consideration, we conclude that the trial court was correct in basing its finding of delinquency on the "preponderance of the evidence" standard. As we find the hearing measures up "to the essentials of due process and fair treatment," we do not believe that the interests of justice require that the delinquency proceedings should have been governed by the "beyond a reasonable doubt rule."

We consider next respondent's contention that "constitutional rights are not lost by minors in Juvenile or Family Court proceedings." The basis of this contention is that the court overruled objections and admitted into evidence strands of hair cut from Robert's head while he was in custody and asleep and a T-shirt taken from his home by police without a warrant. Authorities cited include In re Dennis, 20 App Div2d 86, 244 NYS2d 798, where it is said (p 801):

"It requires no citation of authority to support the principle that even the worst malefactor under our system of jurisprudence must be given a fair trial in accordance with the Constitution and the statutes.

Surely, no less consideration should be given to this cardinal principle because the person charged is under the age of sixteen."

In re Mantell, 157 Neb 900, 62 NW2d 308:

"Can it be that the Legislature by the quoted statement appearing in section 43–206, RRS 1943, intended to destroy the traditional and constitutional safeguards of a trial? Can it be that it intended that trials should be had without the benefit of testimony of witnesses given under the sanction of oath or affirmation? Can it be said that the Legislature intended that the liberty of a child had less sanctity than that of an adult? Even if it did so intend, could that intention be sustained? We think not."

In re Contreras (Cal App), 241 P2d 631 (1952):

"True, the design of the Juvenile Court Act is intended to be salutary, and every effort should be made to further its legitimate purpose, but never should it be made an instrument for the denial to a minor of a constitutional right or of a guarantee afforded by law to an adult."

In re Poff, 135 F Supp 224, at p 226:

"The question boils down simply to whether the legislature could deprive, had it so intended, a youth of these constitutional rights. This Court believes it could not, for in so doing it would be contrary to all principles that only by amendment may the Congress depart from the Federal Constitution. If this deprivation were extended to cover certain crimes committed by adults, it would be condemned by the Courts. Yet by some sort of rationalization, under the guise of protective measures, we have reached a point where rights once held by a juvenile are no longer his. . . . This Court stands steadfast in the

belief that the Federal Constitution, insofar as it is applicable 'cannot be nullified by a mere nomenclature, the evil or the thing itself remaining the same.' "

The State concedes "since some *criminal aspects* are discoverable in a delinquency proceeding, although the risk of criminal prosecution of Robert Urbasek is entirely absent, we assume arguendo that the constitutional protection could have been invoked." However, the State argues that since no pretrial motion to suppress "was voiced, the claim of an illegal seizure has been waived. People v. Ikerd, 26 Ill2d 573, 581."

■ If either the strands of Robert's hair or the T-shirt was obtained in violation of the Constitution as interpreted by the search and seizure authorities, we are not persuaded that the State may assert a claim of waiver against respondent. The protection against unlawful search and seizure is a fundamental right, and its loss by waiver by a minor would be contrary to the spirit of the "laudable purposes of Juvenile Courts," and calls for the use in a delinquency proceeding of the rule "the court may, as a matter of grace, in a case involving deprivation of life or liberty, take notice of errors appearing upon the record which deprived the accused of substantial means of enjoying a fair and impartial trial, although no exceptions were preserved or the question is imperfectly presented." People v. McKinstray, 30 Ill2d 611, 616, 198 NE2d 829 (1964).

■ However, we are not persuaded that the admission into evidence of either exhibit was error. As to the hair, we believe it comes within the guidelines supplied by Schmerber v. California, 384 US 757 (1966), where the taking of a blood sample over objection was held not to be a violation against self-incrimination or the product of an unlawful search and seizure.

■ As to the T-shirt, the police officer who identified it testified, "I went to the Urbasek residence and to Rob-

385

ert Urbasek's room. I took a T-shirt from the closet in the hall which was on the floor in a pile of other soiled clothing, a closet on the second floor directly opposite the bathroom."

In the absence of affirmative evidence in the record that the officer entered the home without permission and without a warrant, we find no error here.

Respondent next contends that the trial court improperly sustained objections to respondent's expert "reading into the record quotations from recognized authorities concerning the reliability of tests performed on dried blood stains." The record indicates that during redirect examination of respondent's expert, he was permitted to read the titles of two publications he had with him and which he had read in preparation for his appearance as an expert. He was then asked to refer to the references "that do go into the reliability of these tests." The court sustained an objection, and the matter was not pursued.

Respondent argues, "It would have been most helpful to the Court at arriving at a proper determination to have had the benefit of these texts, especially since there was such a wide disparity between the margin of accuracy ascribed to these tests, that is, whether or not the tests were in fact 92 percent accurate as maintained by the witness for the People or only from 10 to 20 percent accurate as maintained by the expert witness for the defense." Cited in support of this contention is Darling v. Charleston Community Memorial Hospital, 33 Ill2d 326, 211 NE2d 253 (1965), where it is said (pp 335, 336):

> "The second major contention advanced by the defendant in this court is that it was prejudicial error to permit the cross-examination of its expert witnesses concerning the views of recognized authorities in their fields, upon the ground that the experts did not purport to base their opinions upon the views of these authorities. In support of this contention he relies upon Ullrich v. Chicago City Ry., 265 Ill 338,

and City of Bloomington v. Shrock, 110 Ill 219. Those cases hold that an expert witness can only be interrogated about those texts upon which he expressly bases his opinion. The appellate court held that the cross-examination in this case met that test. We do not consider that determination to ascertain whether every detail on cross-examination of each expert witness fits within the rule announced in those cases, for we are satisfied that the rule is not supported by sound reasons, and should no longer be adhered to.

". . . To prevent cross-examination upon the relevant body of knowledge serves only to protect the ignorant or unscrupulous expert witness. In our opinion expert testimony will be a more effective tool in the attainment of justice if cross-examination is permitted as to the views of recognized authorities, expressed in treatises or periodicals written for professional colleagues."

■ The State concedes that the Darling case changed the rules concerning examination of expert witnesses about learned treatises and argues that the Darling case is not in point here because "it is plain that the ruling pertains to the scope of cross-examination." We agree. As the record discloses that the expert witness for the State did not rely on the authorities in question, nor did respondent's witness specifically rely on them, we find no undue curtailment of the redirect examination of respondent's witness.

Finally, respondent asserts, "A judgment cannot stand unless it is supported by evidence." The State contends that the finding of delinquency was justified by the evidence.

■■ This record indicates that the delinquency hearing was quite extended and all aspects of the evidence were carefully considered by the trial court. The

387

attendant circumstances of the finding of the body and the findings of the microanalyst were substantial evidence and could not be ignored. As the credibility of the witnesses and Robert, and the weight to be given their testimony, was a question for the trial court, who saw and heard the witnesses testify, we find no ground on which to disturb the finding of delinquency made by the trial court, and for the reasons given that judgment is affirmed.

Affirmed.

KLUCZYNSKI, P. J. and BURMAN, J., concur.